AUGUSTE F. DELAURIERE, PLAINTIFF IN ERROR, v. THOMAS EMISON.

The several acts of Congress, passed in relation to claims to land in Missouri, under Spanish concessions, reserved such lands from sale from time to time. But there was an intermission of such legislation from the 29th of May, 1829, to the 9th of July, 1832; and, during this interval, lands so claimed were upon the footing of other public lands, as to sale, entry, and so forth.

By an act of the 6th of March, 1820, (3 Stat. at Large, 545,) Congress gave a certain amount of land to the State of Missouri, to be selected by the legislature thereof, on or before the 1st of January, 1825; and by another act, passed on the 3d of March, 1831, (4 Stat. at Large, 492,) the legislature were authorized to sell this land.

Before the 1st of January, 1825, the legislature selected certain lands, which were then claimed under Spanish concessions, and reserved from sale under the acts of Congress first mentioned.

In November, 1831, the land so selected was sold by the legislature, in conformity with the act of Congress of the preceding March.

This sale having been made in the interval between May, 1829, and July, 1832, conveyed a valid title, although the claimant to the same land was subsequently confirmed in his title by Congress, in 1836.

THIS case was brought up from the Supreme Court of the State of Missouri, by a writ of error issued under the 25th section of the judiciary act. It was an action of ejectment brought by the plaintiff in error, Delauriere, against Emison. Both parties claimed titles under acts of Congress. The case was carried to the Supreme Court of Missouri, where the decision was against Delauriere, and he sued out a writ of error to bring the question before this court.

Delauriere claimed under a Spanish concession, granted by Delassus, and subsequently confirmed by Congress; and Emison, under an act of Congress granting certain land to Missouri, and sold by that State. The history of the laws relating to the adjustment of land titles in Missouri is given with great particularity in the report of the case of Stoddard v. Chambers, 2 How. 285. The following is the history of the two titles in this case, as exhibited in the court below :

*Plaintiff's Title.*

The plaintiff claimed title by virtue of a concession from Carlos Dehault Delassus, Lieutenant-Governor of Upper Louis-

iana, to Louis Labeaume and Charles Fremon Delauriere, for 10,000 arpens of land, at a place called *La Saline Ensanglantee* (The Bloody Saline.)　The tract was surveyed by James Rankin, Deputy Surveyor, and certified by Antonio Soulard, Surveyor-General.　Fremon Delauriere and his family resided upon the land, and made salt upon it in 1800, and for several years afterwards.　The claim was filed with the Recorder of Land Titles, before the 1st July, 1808, and was reserved from sale by the acts of 3d March, 1811, and 17th February, 1818.　It was confirmed to the claimants, or their legal representatives, by the act of the 4th July, 1836.　Louis Labeaume conveyed his interest in the land to Fremon Delauriere, by a deed dated 15th July, 1806, and the present plaintiff purchased the entire interest of Fremon Delauriere at sheriff's sale.

### Defendant's Title.

The defendant set up a title derived from the United States, as follows:

By the 6th section of an act of Congress, approved March 6, 1820, entitled "An act to authorize the people of Missouri Territory to form a constitution," &c., it was enacted that certain propositions be, and the same thereby were offered to the convention of said Territory of Missouri, when formed, for their free acceptance or rejection, which, if accepted by the convention, should be obligatory upon the United States.

Among said propositions was one, as follows, viz. "That all salt-springs, not exceeding twelve in number, with six sections of land adjoining to each, shall be granted to said State, for the use of said State, the same to be selected by the legislature of said State, on or before the 1st day of January, in the year 1825; and the same, when so selected, to be used under such terms, conditions, and regulations as the legislature of said State shall direct: Provided, That no salt-spring, the right whereof now is, or hereafter shall be, confirmed or adjudged to any individual or individuals, shall by this section be granted to said State.

And provided, also, "That the legislature shall never sell or lease the same, at any one time, for a longer period than ten years, without the consent of Congress."　Story's Laws, vol. 3, 1762, (U. S. Stat. Large, vol. 3, p. 545.)　This, with all the other propositions, was duly accepted by said convention of Missouri, by an ordinance adopted July 19, 1820.　Laws of Mo., (by Edwards,) vol. 1, p. 632.　Six of said salt-springs, with the sections c, land adjoining, were selected by the Legislature of Missouri, on or before the 12th day of January, 1822.　The seventh, with the land adjoining, (six sections,) was selected December 14, 1822, by said legislature, as appears by an act approved

that day.   Laws of Missouri of 1822, p. 59; Edwards's edition, vol. 1, p. 83.

Under this last act, and another approved the day next previous, commissioners were appointed for the purpose of selecting the remaining, with the six sections of land adjoining to each, to which the State was entitled under said act of Congress.   Laws of Mo. (by Edwards,) vol. 1, p. 981.

These acts made it the duty of the commissioners to select five springs and adjoining lands, and make their report to the legislature at the next session, to commence the third Monday of November, 1824.   They also made it the duty of the commissioners to file with the register of the land office of the district, where any salt-spring might be selected, a notice of the same, and of the land adjoining each spring, describing as precisely as practicable the locality of the same.   See § 4, Act December 13, 1822.

The commissioners were required to meet in the town of Franklin on the first Monday in September, 1823, or as soon thereafter as might be, and from thence proceed to select the five salt-springs and land adjoining.   Laws of Missouri, 1822, p. 57, Edwards's ed. vol. 1, p. 983.

Said commissioners made the selections and reported to the next session of the legislature, as required, after which, but during that session, by an act approved January 14, 1825, it was enacted as follo ⁊ : " That the following salt springs, with the lands adjoining to each, as hereinafter mentioned, are hereby declared to be selected and accepted for the use of this State, under the provisions of an act of the Congress of the United States, entitled "An act to authorize the people of the Territory of Missouri to form a constitution," (giving the full title of the act,) approved the 6th day of March, in the year one thousand eight hundred and twenty, that is to say, " First Section." Then follows, in regular order, an enumeration and description of the entire twelve springs and the lands adjoining each, which had been selected at various times, as before stated.

The land in controversy in this suit, is a part of that selected through the commissioners appointed under said acts of 1822.

By an act of the Legislature of Missouri, approved January 15, 1831, entitled "An act to provide for the sale of the saline lands," it was enacted, so soon as Congress should raise the restriction thereon, and assent to the sale for the benefit of the State, the twelve salt-springs, together with six sections of land attached thereto, obtained from the United States for the benefit of the State, the whole of the said lands should be offered for sale in a manner particularly described in said act.   Laws of Missouri, (by Edwards,) vol. 2, p. 179.

By the 8th section of an act of Congress, approved March 3, 1831, entitled "An act to create the office of surveyor of public lands for the State of Louisiana," it was enacted that the legislature of said State of Missouri shall be, and is hereby, authorized to sell and convey in fee-simple all or any part of the salt-springs, not exceeding twelve in number, and six sections of land adjoining to each, granted to said State, by the United States, for the use thereof, and selected by the legislature of said State on or before the 1st day of January, 1825." Story, Laws, vol. 4, 2259; Stat. at Large, vol. 4, p. 493, 494.

On the 29th day of November, 1831, the land in controversy was, in the mode prescribed by said act of the legislature, of January 15, 1831, sold to James Emison, under whom the defendant holds, and patents therefor, from the State of Missouri, dated April 26, 1832, were duly executed to said Emison. The plaintiff asked for the following instructions, which the court refused to give, and to which refusal the plaintiff excepted:

1st. That if the land in controversy had been, before the 20th day of December, 1803, conceded by the Spanish government to Fremon Delauriere and Louis Labeaume, and that said land had been surveyed before the 10th day of March, 1804, and that said Delauriere and Labeaume, or their legal representatives, had filed with the Recorder of Land Titles, prior to 1st of July, 1808, notice of said claims; then said claim was reserved, and could not be lawfully selected by the State of Missouri, under provisions of the act of Congress of the 6th March, 1820, provided said claim of Fremon Delauriere and Louis Labeaume has since been confirmed.

2d. That, by the act of Congress of the 6th of March, 1820, the legislature of Missouri could not lawfully select any land which had been, or was thereafter, confirmed or adjudged to any individual or individuals.

3d. That, unless the legislature of the State of Missouri made its selection of the land in question, on or before the 1st of January, 1825, it was illegal, and is not a valid title against a confirmation under the act of the 4th of July, 1836.

4th. That the act of Congress of the 3d March, 1831, conveys no title in any lands to the State of Missouri; said act only authorizes said States to sell, absolutely, lands already granted by the act of the 6th of March, 1820.

The defendant asked, and the court gave, the following instructions to the jury, to the giving of which the plaintiff excepted. The defendant, by his counsel, first moves the court to instruct the jury:

1st. That if they believe, from the evidence in this cause, that the State of Missouri selected the land, on or before the 1st day

of January, 1825, under the 2d clause of the 6th section of an act of the Congress of the United States, entitled "An act to authorize the people of the Missouri Territory to form a constitution, &c., approved the 6th of March, 1820;" and that said State of Missouri sold and patented the said land in controversy in fee-simple to the said defendant, after the 3d day of March, 1831, and before the 9th day of July, 1832, they should find for the defendant.

2d. That, if they shall believe from the evidence, that said land was selected by the State of Missouri, under said act, on or before the 1st of January, 1825, and that said State afterwards, and between the 3d of March, 1831, and the 9th of July, 1832, sold and patented the said land to the defendant, they ought to find for the defendant, although they may believe the said land was confirmed to the plaintiff's landlord by the act of July 4, 1836.

The jury found a verdict for the defendant, which the court refused to set aside, to which refusal the plaintiff excepted. The judgment of the Circuit Court was affirmed by the Supreme Court of the State of Missouri, and the case was removed thence to this court by writ of error.

It was submitted upon a printed brief by *Mr. Wells*, for the plaintiff in error, and argued by *Mr. Geyer*, for the defendant in error.

*Mr. Wells*, for the plaintiff in error, made the following points:

1. The plaintiff in error says that the Circuit Court erred in refusing the first instruction asked by him.

That instruction asserts the principle, that if the land had been by the Spanish government granted to Labeaume and Delauriere prior to the 20th December, 1803, and surveyed prior to the 10th March, 1804, and a notice of the claim filed with the recorder of land titles on or before the 1st July, 1808, that it was reserved from sale and could not have been lawfully selected by the State under the act of 6th March, 1820.

The first branch of the proposition is true beyond all doubt. That these circumstances would bring the claim within the provisions of the acts of 1811 and 1818, and entitle it to be reserved from sale, will not be controverted. The question is, if reserved, could the State lawfully select it under the act of March 6th, 1820. That claims of this description were protected by the treaty of 1803, has long since been settled by this court. See Delassus *v.* United States, 9 Peters, 130; and also 12 Peters, 410. And that the acts of 1811 and 1818 were intended to carry out this provision of the treaty is clear. When the act

of 6th March, 1820, passed, the act of 1818 was in full force. Could the act of 1820 have operated to repeal the act of 1818? In the case of the United States v. Gear, 3 Howard, 131, this court says: "The rule is, that a perpetual statute, (which all statutes are, unless limited to a particular time,) until repealed by an act professing to repeal it, or by a clause or section of another act bearing in terms upon the particular matter of the first act, notwithstanding an implication to the contrary may be raised by a general law which embraces the subject-matter, is considered to be still the law in force, as to the particulars of the subject-matter legislated upon — a power to sell all lands, given in a law, subsequent to another law expressly reserving lead-mine lands from sale, cannot be said to be a power to sell the reserved lands when they are not named, or to repeal the reservation. In the present case there are two laws — the first a general one, reserving lands of this class from sale — the second a special one, not referring to the former, and not necessarily conflicting with it. Each can be enforced without affecting the other. In 6 Porter's Alabama Reports, 231, the court remarks: "The law never favors the repeal of a statute by implication, unless the repugnance be quite apparent." In this case there is no repugnance whatever. The State might have selected its salt-springs without interfering with private claims. The act of 1818 reserved private claims "until after the final decision of Congress thereon." This final decision was provided for by the act of 26th May, 1824, and that act repealed the reservation. The land in question, then, being reserved land when the State appropriated it, the appropriation was unlawful: and, according to the doctrine of this court in the cases of Stoddart's Heirs v. Chambers, 2 Howard, 318, and of Bissell v. Penrose, in 8 Howard, the location was not protected by the 2d section of the act of 4th July, 1836.

The doctrine of those decisions is, distinctly, that to save a location by virtue of the act of July 4, 1836, it must have been made in conformity to law.

2d. The court erred in refusing to give the plaintiff's second instruction.

This instruction asserts that it was not lawful for the State to select any lands which had been or were thereafter confirmed to an individual. These are the terms of the proviso of the very act which made the grant to the State. The act of 1820 not only did not repeal the laws reserving private claims, but it in express terms protected those reservations from the operations of the act. If the act of 1820 had declared to the State of Missouri, that it should not appropriate Labeaume and Delauriere's claim — that if it did select it, and the claim should ever there-

after be confirmed, that the State should get no title, the act could not have been more plain and explicit: "Provided, that no salt-spring, the right whereof now is or hereafter shall be, confirmed or adjudged to any individual or individuals, shall, by this section, be granted to said State." This is a part of the grant itself — a part and parcel of the very act upon which the State claim is founded. Does it mean any thing? Does it protect claims which had been confirmed? It equally in its terms extends to those which might afterwards be confirmed! The language is the same as to both. If it has any effect at all, it must protect all private claims, whether confirmed before or after the act of 1820. I cannot enforce this proposition by argument. It is a simple question, whether this proviso shall be held valid or void. The Circuit Court held that the grant was made good to the State by the 2d section of the act of 4th July, 1836. That decision is at open war with the decisions of this court already cited, in which it is distinctly held, that to bring a location within the saving of that section, it must have been made in conformity to law. So far from this location having been made in conformity to law, it was made in open and direct violation of an express and positive law. The State selects Fremon's lick by name.

3d. The court erred in refusing plaintiff's third instruction. The law of 1820 required that the legislature of the State should make its selection on or before the 1st January, 1825. The third instruction asked the court to decide that, unless the selection was made within this time, it was void as against the plaintiff's confirmation. This the court refused to do. The rule for construing powers, whether derived from an act of the legislature or from a private instrument, is the same. They must be strictly construed. No further or greater power must be exercised than has been given. Any other principle of construction would render all limitations of power nugatory. To say that a grant of power to the State, to be exercised within a specified time, amounts to a grant to be exercised without limit of time, is repugnant to all ideas of limited powers. The Legislature of Missouri had full power to act up to the 1st January, 1825. After that time the power had ceased; any act done afterwards was wholly unauthorized and void. See 4 Pick. 45–47, 156; 6 T. R. 320; 2 Burr. 219. In the last case the court says. "The proviso is a limitation of power, and amounts to a negation of all authority beyond its prescribed and clearly defined limits. It cannot be that the proviso is directory merely, for that would be to set at naught all the guards provided by the legislature against the abuse of authority conferred by the act."

If, then, the selection was made after the power to make it had ceased, it was not made in conformity to law, and is therefore not protected by the 2d section of the act of the 4th July, 1836.

But it is said that the approval of the selection by the Secretary of the Treasury cured all these defects in the State title. To this it may be answered, 1st, that the act of Congress gave to the secretary no power whatever over the subject. His action in the matter was wholly unauthorized by law. 2d. His approval, even if he had the power to approve, came too late. It was made on the 22d August, 1837, after the confirmation of the plaintiff's title; and it was obviously made to heal the defects in the title of the defendant. Its only effect is to render those defects the more conspicuous.

4th. The Circuit Court erred in refusing the plaintiff's 4th instruction.

That instruction simply requested the court to decide that the act of the 3d March, 1831, conveyed no title to the State.

It will be seen that the act of 1820, making the grant to the State, prohibited the State from selling the land, or leasing it for a longer period than ten years. The 8th section of the act of 3d March, 1831, (Land Laws, 491,) removes this restriction, and authorizes the State to sell, in fee-simple, the lands granted to the State, " and selected by the legislature of said State on or before the 1st day of January, 1825, — another evidence that Congress did not regard that provision as nugatory, for the power to sell, like the original grant, was confined to lands selected within the time prescribed. This is the whole scope of this act, and it would be a perversion of its meaning and design to attach to it any other.

5th. The Circuit Court erred in permitting the defendant to read from the journals of the Senate of Missouri a report of commissioners appointed under an act of the legislature of 1822, to make a selection of salt-springs for the use of the State.

It was allowed to be read, for the purpose of showing that the selection by the State had been made within the prescribed time. It was illegal evidence, 1st, because the law required the legislature to make the selection, and that was a power which the legislature could not delegate to commissioners. The rule of law is the same when a power is conferred upon a legislative body, as if conferred on an individual person. The power conferred cannot be delegated.

2d. The report had no date, and therefore did not tend to show, even when they, the commissioners, made the selection. 3d. It was the journal of one branch of the legislature only, and could furnish no evidence of legislative action. 4th. It

was not an authentic copy of the original report. The journals of the senate are only evidence of the action of the senate. But, 5th, the legislature did, by an act approved February 14, 1825, make the selection of the land in question, and this was the best and only legal evidence of the action of that body. See Revised Laws of Missouri of 1825, vol. 2, pages 697 and 700.

6th. The court erred in refusing to grant a new trial. The new trial should have been granted, because the action of court in refusing the plaintiff's, and in giving the defendant's instructions, was contradictory. In refusing the plaintiff's 3d instruction, the court decided that it was not material that the selection should have been made on or before the 1st January, 1825. In giving the defendant's, it assumed that it was necessary. Again — the court, in giving the defendant's instructions, held that if the defendant obtained his title from the State, between the 3d of March, 1831; and the 9th July, 1832, it made his title good. Upon what principle this instruction was founded it is difficult to perceive. The question here is not whether the defendant had obtained a good title from the State, but whether the State had any title to convey. If the State obtained a title under the act of 1820, it is sufficient to defeat the plaintiff. But if the selection of the State was void, and the State got no title thereby, it could never, at any time, convey a good title to the defendant. What magic there was in the particular period that elapsed between these two acts, that enabled the State, when it had no title to convey a good one to the defendant, it would, I think, be difficult to show.

It was decided by this court in Barry *v.* Gamble, that a patent issued to a tract of land after the reservation had been removed, was valid. But this was a patent emanating from the general government, in whom the title was. In this case the patent comes from the State, and it is the title of the State that is questioned. It is clearly a misapplication of the principle invoked, and in this the court erred.

*Mr. Geyer,* for the defendant in error, contended,

That the selection by the State of Missouri of the land in controversy, on or before the 16th day of January, 1825, and the sale and conveyance thereof by the said State, after the 3d day of March, 1831, and before the 9th day of July, 1832, vested in the purchaser a title valid against the United States, which has not been divested by the subsequent confirmation of a claim embracing the same land, by the act of 4th July, 1836, although the same may have been reserved from sale by the act of 3d March, 1811.

1st. The 2d clause of section 6, of the act of 6th March, 1820,

and the ordinance of the Convention of Missouri, of 19th July, 1820, operate as a grant to the State of Missouri of the number of salt-springs and quantity of land therein mentioned, leaving the selection of the springs and land to the State legislature.

No act of the Federal Government was necessary to locate or designate the granted lands, the selection by the legislature within the time prescribed, severed the land selected from the domain, and vested the title in the State of Missouri.

2d. The act of the 6th March, 1820, does not except from the grant to, or selection by the State, the lands reserved from sale by the act of 1811. By the terms of the grant, lands embraced by claims, of which notice had been filed, are subject to appropriation by the State, as well as those embraced by claims of which no notice had been filed, or to which there was no claim whatever.

The reservation by the act of 1811, vested no title in any person; it suspended the authority of the executive officers to sell, but did not affect the power of Congress over the subject; the land belonged to the domain, notwithstanding the reservation, and was subject to disposition by law.

3d. The confirmation of the claim embracing the land in controversy, after the selection by the State, and especially after the 3d March, 1831, neither vested a title in the claimant nor divested that of the State of Missouri or her vendee.

The first proviso excepts from the grant any salt-spring, the right whereof was, at the date of the act, or should be before the grant was completed by the selection, confirmed or adjudged to an individual or individuals. It does not except the adjoining lands, nor does it contemplate that the selections shall be subject indefinitely to defeat by confirmations of claims, whether there had been a reservation of the land from sale or not.

4th. The act of Congress of 3d March, 1831, (Stat. at Large, vol. 4, p. 494,) authorizing the State to sell and convey in fee-simple the salt-springs and lands granted by the act of 1820, and selected on or before the 1st January, 1825, is a confirmation of the selection made; and the sale and conveyance by the State vested the title in the purchaser, even if the land was not subject to selection, by reason of the reservation from sale by the act of 3d March, 1811.

The act authorizing the State to sell was passed, and the land in controversy sold and conveyed after the 26th of May, 1829, when the reservation ceased, and before it was revived by the act of 1832. The title of the defendant is therefore valid as against the confirmation. Stoddard v. Chambers, 2 How. 285; Mills v. Stoddard, 8 How. 345.

5th. The act 4th July, 1836, conferred no title to the land in controversy as against the purchaser from the State of Missouri, by virtue of the act of Congress of 3d March, 1831, because the title of such purchaser was vested prior to the 9th day of July, 1832, and could not be divested by any subsequent act of Congress, and because the land in controversy had been located and appropriated by the State of Missouri, and surveyed and sold under and in conformity with the laws of the United States. Any appropriation of land in conformity with a law of the United States, is a location under a law of the United States, and protected against a confirmation by the act of 1836.    Les Bois *v.* Brammell, 4 How. 449, 456.

Mr. Justice McLEAN delivered the opinion of the court.

This case is before us on a writ of error to the Supreme Court of Missouri, under the 25th section of the judiciary act.

The plaintiff claims title by a Spanish concession to Lewis Labeaume and Charles Fremon Delauriere, for ten thousand arpens of land, at a place called La Saline Ensanglantee.    The tract was surveyed and regularly certified by the Surveyor-General.    The plaintiff resided upon the land in 1800, and for several years afterwards.

The claim was filed with the Recorder of Land Titles before the 1st of July, 1808, and was reserved from sale by the acts of 3d March, 1811, and the 17th February, 1818.    It was confirmed to the claimants, or their legal representatives, by the act of the 4th of July, 1836.    Louis Labeaume conveyed his interest in the land, to Fremon Delauriere, by a deed dated 15th July, 1806 ; and the present plaintiff purchased the entire tract of Fremon Delauriere at sheriff's sale.

The defendant claims under an adverse title, derived from the State of Missouri.    By an act of Congress, approved the 6th of March, 1820, entitled "An act to authorize the people of Missouri Territory to form a State Government, and for its admission into the Union," it was among other things provided — that all salt-springs not exceeding twelve in number, with six sections of land adjoining to each, shall be granted to the said State, the same to be selected by the legislature of the State, on or before the first day of January, 1825 ; and the same so selected, to be used under such terms, conditions, and regulations, as the legislature of such State shall direct, &c.

By another act of Congress, approved 3d March, 1831, the Legislature of the State of Missouri were authorized to sell, in fee-simple, the lands granted by the above act.    Under this act the State sold the land in controversy to the defendant.

The questions arise under instructions prayed for by the plain-

tiff, and refused by the court; and also the instruction given on the prayer of the defendant.

"1. That if the land in controversy had been, before the 20th day of December, 1803, conceded by the Spanish Government to Fremon Delauriere and Louis Labeaume, and that said land had been surveyed before the 10th March, 1804, and that said Delauriere and Labeaume, or their legal representatives, had filed with the Recorder of Land Titles, prior to the 1st July, 1808, notice of said claim, then said claim was reserved, and could not lawfully be selected by the State of Missouri under the provisions of the act of Congress of the 6th March, 1820, provided said claim of Fremon and Labeaume has since been confirmed.

"2. That by the act of Congress of the 6th March, 1820, the Legislature of Missouri could not lawfully select any land which had been, or was thereafter, confirmed or adjudged to any individual or individuals.

"3. That unless the Legislature of the State of Missouri made its selection of the land in question on or before the 1st of January, 1825, it was illegal, and is not a valid title against a confirmation under the act of the 4th July, 1836.

"4. The act of Congress of the 3d of March, 1831, conveys no title to any lands to the State of Missouri. Said act only authorizes the State to sell, absolutely, lands already granted by the act of the 6th of March, 1820."

"The defendant, by his counsel, moves the court to instruct the jury that if they believe, from the evidence in this cause, that the State of Missouri selected the land in controversy on or before the first day of January, 1825, under the second clause of the 6th section of an act of the Congress of the United States, entitled 'An act to authorize the people of the Missouri Territory to form a Constitution,' &c., approved 6th March, 1820, and that said State of Missouri sold and patented the said land in controversy, in fee-simple, to the said defendant, after the 3d day of March, 1831, and before the 9th day of July, 1832, they should find for the defendant. That if they shall believe, from the evidence, that said land was selected by the State under said act on or before the first day of January, 1825, and that said State afterwards, and between the 3d of March, 1831, and the 9th July, 1832, sold and patented the said land to the defendant, although they may believe the said land was confirmed to the plaintiffs' landlord by the act of the 4th July, 1836."

And this instruction was given by the court.

We think the court did not err in refusing the instructions prayed by the plaintiff, nor in giving that, which was asked by the defendant.

Delauriere v. Emison.

Notice of the plaintiff's claim was, on the 30th of June, 1808, given to the Recorder of Land Titles for the Territory of Louisiana, and the grant, survey, and title papers, were filed with the recorder and duly recorded.

On the 27th of December, 1811, the claim was taken up for consideration by the board of commissioners for the adjustment of land titles, under the act of March 2d, 1805, and rejected.

The claim was again presented to the board of commissioners, organized in pursuance of the act of Congress of July 9th, 1832; and afterwards, on the 13th of November, 1833, the board were unanimously of the opinion, that the claim ought to be confirmed to the said Charles F. Delauriere and L. Labeaume, or their legal representatives, according to the concession.

This proceeding of the commissioners was reported to the Commissioner of the General Land Office; and on the 18th of January, 1834, it was communicated to Congress; and the decision was confirmed by the act of Congress of July 4th, 1836.

By the act of 2d March, 1805, all persons claiming land under the French or Spanish government, were required to file their claim in the land office — and by the act of 3d March, 1807, the time was extended to 1st July, 1808. By the act of 15th February, 1811, the President was authorized to have the lands which had been surveyed in Louisiana, offered for sale — reserving those tracts for which claims had been filed in the land office, as above required, till after the decision of Congress thereon. The same reservation was contained in the act of the 17th February, 1818.

The act of 26th of May, 1824, authorized claimants, under French or Spanish grants, concessions, warrants, or orders of survey," in Missouri, issued before the 10th of March, 1804, to file their petitions in the district courts of the United States, for the confirmation of their claims. And every claimant was declared by the same act to be barred, who did not file his petition in two years. By the act of the 24th May, 1828, the time for filing petitions was extended to the 26th of May, 1829. On the 9th of July, 1832, an act was passed, " for the final adjustment of land titles in Missouri, which provided that the Recorder of Land Titles, with two commissioners, to be appointed, should examine all the unconfirmed claims to land in Missouri, which had heretofore been filed in the office of the said recorder, according to law, prior to the 10th of March, 1804.

On the 29th of November, 1831, the land in controversy was, in the mode prescribed by act of the Legislature of Missouri, or the 15th January, 1831, sold to Emison, under whom the defendant holds, and a patent was duly issued by the State.

The reservation under the act of 1811, was extended by the

act of the 17th of February, 1818, to the act of 26th of May, 1824; which authorized claimants to file a petition in the district court—and this right was limited to two years; it was afterwards extended to the 26th of May, 1829. The reservation then expired, or in other words, the bar to the right was interposed. On the 9th of July, 1832, a further provision was made for the adjustment of such claims. But after the interposition of the bar, and before the passage of the act of 1832, the land in controversy was purchased from the State of Missouri, and a patent obtained. During this period there was no protection to the inchoate right of the original claimants. When the State of Missouri selected the land it was reserved from sale, but that impediment was removed, when the limitation expired in 1829.

The confirmation of the claim by Congress, in 1836, had relation back to the origin of the title; but it could not impair rights which had accrued, when the land was unprotected by a reservation from sale; and when, in fact, the right of the claimant was barred. This point was settled in the cases of Stoddard *v.* Chambers, 2 Howard, 285; and of Mills *v.* Stoddard, 8 Ib. 345.

As the instructions prayed by the plaintiff in the State court, were in conflict with the law as above stated, they were properly overruled; and as the instruction given, at the instance of the defendant, was substantially in accordance with the above views, it was correct. The adjustment of the State court is, therefore, affirmed with costs.

## Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Missouri, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, affirmed, with costs.