MINIS *et al. v.* NELSON *et al.*

*(Circuit Court, S. D. Georgia.   April Term, 1890.)*

1. CUSTOM—REASONABLENESS—PRINCIPAL AND AGENT—SHIPPING.
    A custom that an agency to act for a ship in distress is irrevocable is invalid, as being unreasonable.
2. SAME—COMPENSATION OF AGENT.
    A custom that the agent of a ship in distress shall receive in all cases a custody commission of 2½ per cent. upon the value of the cargo discharged, and an attendance fee in the discretion of the agent, is void as to the attendance fee for want of uniformity, but valid as to the commission.
3. VERDICT—ATTORNEYS' FEES.
    Where a defendant has acted in bad faith, and has been stubbornly litigious, the jury may allow plaintiff an attorney's fee as an element of damage.

At Law.

This was an action by A. Minis & Sons to recover for services as ship agents. The jury found for plaintiff in the sum of $4,316.78.

*Chisholm Erwin* and *Wm. Bignon*, for plaintiffs.

*George A. Mercer*, for defendants.

SPEER, J., *(orally charging the jury.)*   This suit is brought by A. Minis & Sons, for $5,573.45, besides interest from the 16th day of December, 1887. This sum is made up of several charges, to which the court will presently refer you. The plaintiffs are commission and shipping merchants and brokers in Savannah. The defendants are owners of the British steam-ship Naples. The plaintiffs were the agents or consignees

of the Naples for the general and ordinary purposes of its voyage to this port. They were charged with the usual duties incumbent upon ship-agents in reference to a steam-ship like the Naples, to be loaded at the port of Savannah with a cargo for a foreign port. For that agency they were paid a stipulated sum, which is in no sense a matter of controversy here. Pending the lading of the Naples, at 6 o'clock in the evening of the 6th day of October, 1887, a fire broke out in the cargo. From that moment the Naples was a ship in distress, and the plaintiffs insist that they were employed to act as the agents for the Naples with reference to her distressed condition; that there was a new contract, entirely distinct and different from the ordinary contract of agency which they had been performing; and that as such agents for the ship in distress they are entitled, under the facts of the case, to the sums for which they bring this suit under the declaration setting out these facts. The defendants file the plea of general issue. Under this plea they deny that the plaintiffs were their agents in the sense which the agents can charge commission for the custody of a vessel, or in this case for the custody of a cargo of a ship in distress. They insist that if Minis & Sons began, under any kind of authority, to act as such agents, that authority was revoked. They say that there is no provision of law or custom for the charges of the plaintiffs, which they insist are exorbitant. This denial extends to all the charges in the declaration, to all the demands of the plaintiffs,—the demand for custody commission, for attendance fees, and attorney's fees. The defendants admit that for any actual services A. Minis & Sons may have rendered they may be entitled to recover a small amount, which the counsel for the defendants, in his argument, said should not exceed $750. They are not entitled, the defendants insist, to recover the sum sued for, or anything like it. The items of the plaintiffs' demand are as follows: To attendance as ship-agents for the vessel in distress at and after the fire, October 6, 1887, $750; to commissions for the care and custody of cargo of the steam-ship Naples, 2½ per cent. on the value of the cargo,—$172,671.12,—$4,316.78; which aggregate, $5,066.78. They then insist that they are entitled to recovery attorneys' fees for the unwarrantable and litigious spirit which they say the defendants have shown in this case, which attorneys' fees they prove to be, in case they are recoverable, $506.67, or 10 per cent. upon the amount which they insist they should recover. They insist, further, that if they are not entitled to recover these precise sums they are entitled to recover what the proof shows their services are worth,—*quantum meruit*, or as much as they merited.

The prominent feature in the case of the plaintiffs is their averment that there is in the port of Savannah a usage or custom which is of sufficient authority in a court of justice to justify their demands. Their definition of that custom is as follows: They insist, and offer proof to show, that if the agent or ship-broker proffers his services to the master or other person in control of a ship in distress, or if, upon the request of the master or other person in control, the agent agrees to act, in either case the agency is complete; that it is not only complete, but that it is

continuous until the matter is ended, and is not revocable. They further define the custom to authorize a charge for attendance in proportion to the services rendered, which charge is testified to be discretionary with the ship-agent; that the custom authorizes these charges,—the attendance fee, which is discretionary; the custody commission for the custody of the cargo, which is 2½ per cent. upon its value, and 2½ per cent. upon all disbursements for the ship. It is well, however, to consider at this point that there are no charges for disbursements here, and therefore we are not to consider disbursements in this case. These are the features the plaintiffs insist appertain to the custom. Now, what is a custom? A custom is an unwritten law, established by long usage and the consent of our ancestors. Usage is the legal evidence of the custom. It may be further defined to be usage which has obtained the force of law, and is, in truth, the binding law within a particular district or at a particular place as to the persons and things which it concerns. Now, it is for you, under the rules of law which I shall give you, to determine whether there has been shown in this case such usage,—that is, the use and practice of the trade, the shipping merchants' trade,—which usage has obtained the force of law, and is binding law within a particular district or at a particular place, to-wit, the port of Savannah, as to the persons and things which it concerns; that is, as to the ship-agents and the owners of ships which ply to and from this port. Now, before a custom or usage can be of the binding force of law, it must be shown to exist by proof, and this proof must be made by the person seeking an advantage under the custom or usage in this case. Of course, you understand that the plaintiffs are seeking an advantage under the alleged custom here, and therefore they must show by proof the existence of the custom. Now, what else must the proof show? First, it must show that the custom is certain. If the proof leaves the custom uncertain, either as to the fact or as to its effect on the matter with which it is related, it is void as a custom; it is a nullity, and nothing can be taken under it. Because the court advises you, however, that the custom must be shown by the proof to be certain, you must not understand that it must be used by everybody, and at all times; it must be certainly shown, however, to be the custom,—the general usage of the trade at this port. Again, the custom must not only be certain, but it must be reasonable in itself; and whether reasonable or not, is not a question for the jury, but that is for the court to decide, and instruct the jury. The custom must have existed from time immemorial. If any one can show its beginning it is no good custom. Again, the custom must be continued, without any interruption, for an interruption will cause a temporary cessation of the custom, and the beginning would be remembered, and therefore it would not be from time immemorial. Any interruption of the right is meant, and not its actual practice in exceptional cases. If there was a distinct and general abandonment of the right, under the facts of such a custom by the trade at this port, it would cease to exist. Now, what is the main object and use of a custom of this character? It is, gentlemen, to interpret and make plain the intentions

of the parties which may otherwise be undetermined,—that is, uncertain; and to ascertain the nature and extent of their contracts,—contracts arising not from express stipulations, that is, express contracts, but from acts of a doubtful character, or from implications and presumptions. The use of a custom, I may illustrate to you by the facts of this case: If, when Mr. Minis went aboard the steam-ship, there was a distinct express contract between him and the master to pay a certain sum, that would end the matter; but if he went to report to the master, and the master accepted his services and took his advice, and he went forward and rendered the services of a ship-agent to a ship in distress, and there was no precise, definite, express contract between him and the master, then the nature of the contract between the agents and the ship-owners must be determined by the custom, if there be such custom.    To enable you to ascertain what really was their contract, under the circumstances, you must consider the custom of the trade at this port.    If the custom is otherwise shown to be definite, certain, uniform, reasonable, immemorial, and to possess the other requisites to which I have called your attention, the entering into the contract would be a part of it, and the jury would be justified in holding that the parties acted in view of the custom, whether they both had the custom in mind at the time or not.

Now, do the facts show such a custom?    Upon this subject you must remember the testimony of several gentlemen who testified here as witnesses.    You remember what it was.    The testimony which the court, however, has in hand was offered by the defendant, and it is the testimony of a witness who seems to be an expert upon this general subject; and the court, as is the practice in our court, will read you what he testifies.    This is Mr. Gourlie, who testified as follows:

"I am a member of the firm of Johnson & Higgins; average adjusters and insurance brokers.    That firm has been engaged in such business, I believe, some forty years; and I have pursued the business of average adjusting some twenty years.    I have a familiarity with the manner in which general average adjustments are made up, and the charges allowed in them; and if a custody commission is one of the charges in the accounts submitted to us as adjusters it is the custom in this port to allow such custody commission in general average.    According to the usage of this port the percentage of such custody commission varies, running from two and one-half per cent. upon the value of the cargo discharged, which is the rate fixed by the regulations of the chamber of commerce as one of the charges of this port, down in some cases to one per cent. upon the value of the cargo discharged.    The custody commission depends upon whether a cargo has been discharged from the vessel in distress.    If no discharge has occurred, there is no custody commission chargeable; consequently in the adjustment of such cases we do not have to deal with such an item.    A custody commission, or charge for the care of cargo discharged in distress, is, I believe, customary in this port.    We have adjusted averages in our office wherein appeared an allowance of custody commission to the consignee of a vessel in Savannah.    I recall several such cases, in each case of which the custody commission was two and one-half per cent. upon the value of the cargo discharged in distress.    I can remember at least five cases within the past five years where a custody commission of two and one-half per cent. has been allowed to the consignees in the port of Savannah.

A custody commission prevails in all the ports of the United States, so far as I know. The percentage of commission varies. Two and one-half per cent. is the prevalent rate in Philadelphia, and this rate prevails, to the best of my knowledge, in more of the ports of the United States than does any other rate of commission. It is a more general commission than is any other rate of percentage. In Charleston, also, the usual commission for custody is two and one-half per cent. I can also recall cases at Norfolk, Va., Halifax, N. S., Nassau, N. P., St. Thomas, W. I., and Fayal, in each of which a custody commission of two and one-half per cent. was charged."

This gentleman was a witness for the defendants, and as it is not contradicted the defendants are bound by his evidence. The court reads it, as it shortens the matter. The court states to you that if you believe the testimony of that gentleman, Mr. Gourlie, you may well conclude that there is a custody commission of 2½ per cent. on the value of the cargo of vessels in distress, when the cargo has been discharged, which custom exists at the port of Savannah. While there is some little variation in particular cases in reference to the charge of 2½ per cent. as custody commission, there does not seem to be any difference of opinion among the witnesses at all about the existence of the custom.

The court charges you further that if the custom is of that character that it would prevent a ship-owner from revoking the agency, then it is an unreasonable custom, in that respect, and in violation of the several principles of the law of agency. The power of an agent may be revoked at any time by the principal, without notice; but if the agent in the prosecution of business of his principal has fairly and in good faith, before notice of the revocation of his power, entered into any engagements, or has incurred any liabilities, the principal will be bound to indemnify him. Now, you understand that announcement of the court. If it be true, as testified by the witnesses here, that the custom prevents a ship-owner from revoking the agency of his agent, that custom in that respect is unreasonable, and has no legal force. It is true, however, that where the agency is revoked it would not deprive the agent of a fair compensation for the services which he had rendered before it was revoked. If you find from the evidence in this case that the agency was revoked, the plaintiffs would not be entitled to recover the full amount of their demand, but they would be entitled to recover a fair compensation for the services they had rendered; and, if they suffered loss because of any engagements which they had entered, or upon any liabilities they had assumed, the principal would be bound to indemnify them for the losses. The important question here is to determine whether the agency was in fact entered upon, and, if entered upon, was it in fact revoked? Had Minis & Sons entered fairly upon the agency of the Naples in distress? That you will determine from all the evidence. You will remember the testimony of Mr. Minis upon that subject. It is not necessary that the court should go over that matter again with you. The testimony of the defendants' witness, Capt. Rulffs, is as follows:

"When I stood amid-ships, the captain of the Resolute asked me if I made any agreement with the tug-boat. Same time Mr. Minis came up. The next tug-boat came then, and I asked Mr. Minis what we were going to pay them,

and he said $20 per hour. Mr. Minis made the agreement with the second tug-boat at $20 per hour. We asked the first tug-boat, but it would not make any agreement. Mr. Minis said he would try and get it for $20 per hour. Mr. Minis told me to cut holes in the deck on the port side. There were fine holes cut. Engines were at fire all night. Holes were cut in the morning to put the hose down through the deck. Fire hottest between the main and fore hatches. At the time of the fire I knew ship was consigned to Minis & Sons. Mr. Minis was agent of the ship at that time. I consulted him as adviser, knowing he was agent at the time. I did not take agency away until Saturday morning, on a cable from my owners. The stevedores commenced discharging Friday about 11 A. M. The stevedores were Reilly & Marmelstein. On Friday afternoon Mr. Putnam could not see that stevedores were working right. The discharging was too slow," etc.

[He testified further, as I remember, a survey was called by Mr. Minis at his request.]

"When I got first cable from my owners, protesting against Chubbs' sanction —

[Chubbs, as you will remember, represented the indemnity club, which club is responsible, in part, at least, for the losses of the ship.]

protesting against Chubbs' sanction of Minis & Sons' unjust charge, I told Mr. J. F. Minis that he was no longer my agent, and that is what I meant when I said I revoked the agency in the direct examination. It was on Saturday, October 8th, that I met Mr. J. F. Minis in front of the Cotton Exchange, and he asked me why I called a survey without letting him know; and then I told him he was no longer my agent, and I would keep the ship in my own hands. On Friday, October 7th, went to Minis' office with Putnam, and he wanted to give the agency to them for $3,000."

That, gentlemen, is the material testimony of the captain upon the facts as to whether or not Minis & Sons entered upon a contract. Mr. Minis testified he did. He testified, further, that the only matter in dispute between him and the captain or the owners was the amount of his compensation; that he always insisted that he was to have the usual charges of the port as justified by the custom; that, by way of compromise, at one time he agreed to receive $3,000. That proposition was not carried out, and therefore is no guide for the jury in this case. He denies the statement of the captain that he was ever discharged from the agency, but that the captain threatened to discharge him if he did not come to his terms. The following is a letter from the captain to Minis & Sons on the subject of the price, which is in evidence before you:

"In regard to your price for agency of S. S. Naples, I consider same far to high; and, as it is protested both by my owners and by insurance club, you will have to come considerable down in the figures if you intend to have the business. At all events, I will see you on Monday; if not, you might favor me with a reply. Perhaps other instructions will turn up. Until then, I remain, gentlemen, yours, respectfully,     CLEMENS RULFFS, Master."

Again, on the 10th October, 1887, he writes:

"Messrs. Minis & Co.—GENTLEMEN: Confirming my letter of the 8th inst., I beg to express surprise at having no reply to it, which common courtesy alone would seem to dictate. Since the fire I have had no agent to consult with, and I feel the time is coming when I shall need some one. Unless I receive an early reply that would prove reasonable and acceptable, I shall feel

compelled to look elsewhere in the event of my requiring an agent to confer with and to act for my ship. Until then, I remain, gentlemen, yours, respectfully, CLEMENS RULFFS, Master."

To this Messrs. Minis & Sons replied as follows:

"Your note of this date is at hand. We did not understand that your communication of the 8th inst. called for any reply, inasmuch as you asked for one only in the event of your not seeing us to-day. Besides no inquiries are made therein. We beg to say that our experience and advice are open to you, and we are ready now, as we always have been, to continue to fulfill our duties as agents in rendering you as well as the ship and cargo any services in our power. If you desire to confer with us as is customary for a master to do with his agents, our time and judgment are at your disposal.

Yours, respectfully, A. MINIS & SONS."

That, gentlemen, is the correspondence upon the subject. You must take that correspondence, and all the other facts in the case, and determine from it whether or not the agency was revoked. If the correspondence stood alone, and unsupported by any other evidence, it would show that the agency was revoked, as a matter of law, notwithstanding Messrs. Minis & Sons' opinion that they were still the agents of the ship. They rely for that opinion upon that feature of the custom which has been testified to by the witnesses here, which feature is invalid. But the letters did not stand alone. They must be considered in connection with all the other facts of the case. You must bear in mind the testimony of Mr. Minis that the captain was constantly going to his office to consult him in reference to the business of the ship, and, in view of the conflict between the captain and Mr. Minis, you must determine whether or not Mr. Minis' testimony is credible, and, if credible, how far it will help you in your decision as to whether or not the agency was revoked.

A very important matter depends upon the telegram of the 17th of October, from the owners of the vessel to the captain, the master of the vessel, who are the defendants in this case. The fire, you will remember, took place on the 6th, and all of this correspondence and negotiations were pending and carried on in the period between the 6th and the date of this cable, which is the 17th. It is in evidence that the defendants were advised of the condition of affairs here by the master. They understood that Minis & Sons were standing out for the custody commission. They had instructed the master to refuse to agree to the custody commission. With that knowledge, on the 17th of October, they send this cable to Minis & Sons:

"Private; confidential. Consider ship's interests. End voyage at Savannah, forwarding sound and partially damaged cotton to destination, claiming freight in general average adjusted America. Wire your opinion."

Now, it is the duty of the court to construe this cable to the jury. It was received after, as I have said, the controversy was fully understood, or after they had the opportunity of fully understanding the controversy and its features as it existed here. They send this cable: "Private; confidential." Is that addressed, gentlemen, to one who is not the agent of the ship? What right would they have to send a private and confidential cable to one who was not an agent of the ship? "Consider ship's

interest." Who is to consider the ship's interest? The agent, of course. "End-voyage at Savannah." What voyage? Why, the voyage on which the Naples was then engaged,—the voyage to Savannah for the cargo of cotton, and the voyage from Savannah to destination, where that cotton was to be delivered. "End voyage Savannah, forwarding sound and partially damaged cotton to destination." That manifestly refers to the cotton of the Naples,—that portion which had been left intact and sound, and that portion which had been damaged. "Claiming freight in general average adjusted America." That means they must go on and adjust the general average, just as a ship-agent would do if his agency had never been terminated, according to the American rule fixing average. "Wire your opinion." It is impossible for the court to have any other opinion, or to give you further instruction, on this point, save that this cablegram ratifies, fully and completely, Messrs. Minis & Sons as the agents for the ship in distress; and, if that be true, and if it further be true that a custom existed at this port by which they were entitled to charge 2½ per cent. custody commission, they would be entitled to make that charge. The court charges you further in reference to this custom, that the charge for attendance fee is not shown to be universal; the testimony of the witnesses varies upon that point. Sometimes it is charged, where the general custom is employed, some of the witnesses say, sometimes it is not charged. This, therefore, does not possess the feature of uniformity and universality which makes an attendance fee a custom. No custom, also, can be good where all the discretion is on one side. In any event, the plaintiffs are not entitled to an attendance fee in this case. The court charges you further that if you believe from the evidence, and in view of all the directions which the court has given you upon the subject, that no such custom existed in Savannah, in that event Minis & Sons would be entitled to recover what they merited in this case; but, if you find your verdict upon the custom, you pay no attention to the count in the declaration, which makes a demand for a sum in proportion to the merit of the services which they have performed. If you find under the custom you should find 2½ per cent. upon the fixed value of the cargo, which the court understands from the counsel is $4,316.78. There is one further feature to which I wish to call your attention, and I charge you at the request of the counsel for defendant; the expenses of litigation are not generally allowed as a part of the damages, but if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow the expenses of litigation. The jury are not obliged to allow attorney's fees; it is optional with them. Before the jury can allow attorney's fees, they must *first* find that the defendant has acted in bad faith; *second*, that he has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense. If you find, therefore, gentlemen, that the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, you may consider attorney's fees as an element of your finding, and, if you do, it is agreed that 10 per cent. of

the amount of your verdict, which you will otherwise assess, would be a fair and proper recovery for attorneys' fees. If you find that the defendants have acted in good faith, and have not been stubbornly litigious, or have not caused the plaintiffs unnecessary trouble and expense, the plaintiffs cannot recover attorney's fees. If you find for the plaintiffs, your verdict will be: "We, the jury, find for the plaintiffs the sum of ———, with costs of suit." If you find for the defendants, your verdict will be: "We, the jury, find for the defendants."