## UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION v. LEVENSALER et al.

(Court of Appeals of District of Columbia. Submitted May 1, 1923. Decided June 4, 1923.)

No. 3913.

1. Customs and usages ⇒1—"Practice" is synonym for "custom" and "usage."

   The word "practice," within an instruction referring to the practice of a particular business, is a synonym for "usage" and "custom," though there is a distinction between a usage and a custom; the latter being a part of the common law, while a usage is the law of the particular case governing the parties.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Custom; Practice; Usage.]

**2. Customs and usages ⚖️3—Must be general and uniform, and acquiesced in for a long period.**

To establish a trade usage, the proof must show the practice has been both general and uniform in the trade, and has been peaceably acquiesced in without dispute for a long period.

**3. Customs and usages ⚖️3—Instruction that practice followed by large proportion of trade was binding was erroneous.**

An instruction that, if the practice relied on was generally followed by a large proportion of the persons in that business, it was valid, without requiring a finding it was certain and uniform, or that it was the rule of all in that trade, was erroneous.

**4. Customs and usages ⚖️5—Usage must be that of all those engaged in the business.**

It is not enough to establish a trade usage that it be followed by a part only of the persons engaged in the business to which it applies; but it must be the usage of all, though it is not necessary that every one engaged in the business should always follow the usage.

**5. Customs and usages ⚖️12(1)—Shipowner held not charged with knowledge of custom of shipping business.**

The Emergency Fleet Corporation, engaged in the transportation of goods, including grain, by vessel, is not thereby charged with knowledge of a usage binding on shippers of grain, since the business of shipping grain is different from that of carrying it.

**6. Evidence ⚖️22(2)—Court judicially knows Emergency Fleet Corporation transported many different kinds of freight.**

The court judicially knows that the Emergency Fleet Corporation was engaged in carrying many different kinds of freight, and for persons engaged in widely different lines of business.

**7. Customs and usages ⚖️7—Unreasonable usage is not binding.**

To charge a corporation operating vessels with constructive knowledge of the methods of business pursued by each shipper in making his contracts of sale and collecting the purchase price would be unreasonable, and a usage which is not reasonable is not binding.

**8. Customs and usages ⚖️22—Instruction as to knowledge of custom held erroneous.**

An instruction that the Emergency Fleet Corporation might be held liable if it should have known of a custom in the grain-shipping business, knowledge of which was not imputable to the corporation, without stating the facts or circumstances which would warrant the jury in finding that the corporation should have known of the custom, was erroneous.

**9. Customs and usages ⚖️12(1)—Knowledge of custom must be possessed at time of contract.**

If knowledge of a trade usage was not possessed by defendant at the time the contract was made, it cannot be presumed to have been within its contemplation.

**10. Pleading ⚖️17—Facts should be pleaded positively and directly.**

Facts should be pleaded positively and directly, and should not be left to be deduced by argument and inference.

**11. Shipping ⚖️132(2)—Declaration for damages caused by delay in transporting grain held defective.**

A declaration seeking to recover from the Emergency Fleet Corporation, for its delay in transporting plaintiff's grain, the amount lost by the shippers because of the drop in exchange in pounds sterling, which did not directly allege that the grain had been sold, nor that the usage among shippers of drawing on the buyers when the bill of lading was issued was general where the contract of shipment was executed, or that defendant was familiar with it, was defective, and should be amended.

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the Supreme Court of the District of Columbia.

Action by C. Levensaler and others, partners doing business as W. D. Sheldon & Co., against the United States Shipping Board Emergency Fleet Corporation. Judgment for plaintiffs, and defendant appeals. Reversed and remanded, with directions to grant a new trial.

Peyton Gordon and Vernon E. West, both of Washington, D. C., for appellant.

J. Harry Covington, Spencer Gordon, and Newell W. Ellison, all of Washington, D. C., for appellees.

Before SMYTH, Chief Justice, ROBB, Associate Justice, and SMITH, Judge of the United States Court of Customs Appeals.

SMYTH, Chief Justice. Levensaler and others, partners, under the name of W. D. Sheldon & Co., instituted an action in the Supreme Court of the District of Columbia against the Shipping Board Emergency Fleet Corporation to recover damages alleged to have resulted from a failure of the Shipping Board to perform a contract to load and transport a quantity of barley. A demurrer to the declaration having been overruled, the defendant pleaded that it had never promised and was not indebted as alleged. Issue was joined upon the pleas, and the case proceeded to trial before a jury, which resulted in a verdict for the plaintiffs, on which judgment was entered.

The declaration charged that on June 30, 1919, plaintiffs entered into a written contract with the defendant, whereby the latter promised to ship by steamer for the plaintiffs a quantity of barley to England from New Orleans, "shipment as required, by steamer, but not later than July 20," same year; that the plaintiffs at all times from June 30 had the barley for shipment, and that the defendant failed to furnish the steamer until September 23, 1919; that it was the general practice at the time in question for shippers of grain from the United States to England to draw on the purchasers of cargoes for the purchase price in pounds sterling, and as soon as the goods were shipped to sell such drafts, with the bills of lading attached, to banks in the United States; that the practice was necessarily known, or should have been known, to all persons engaged in the carriage of ocean cargoes, including the defendant; that fluctuations in exchange had been common since the outbreak of the Great War; that it was known to the defendant, or should have been reasonably contemplated by it, that a delay in the shipment of plaintiffs' barley would result, in all probability, in a change in value of the pound sterling, and that the plaintiffs would, because of this delay, receive as the price of their merchandise less in dollars than they would have received had there been no delay. The declaration further averred that, immediately upon the receipt from the defendant of the documents issued upon the barley then in the defendant's steamer, the plaintiffs drew upon the purchasers for the purchase price, payable in pounds sterling, and sold the drafts, with the documents attached, to bankers, and that on July 21, 1919, the value of the pound sterling in American money was considerably higher than on September 23, 1919, when the barley was loaded.

There is no direct allegation that the barley was sold. The only thing said with respect to that is that "the plaintiffs drew upon the purchasers." The contract of sale, if there was one, is not set out either in terms or effect; but, assuming that there was a sale, it does not appear that the purchaser refused to accept the barley and pay the price agreed upon. Defendant settled with plaintiffs for the charges which the latter paid for storing the barley, and for loss of interest on the purchase price of the cargo during the delay, and the only thing the plaintiffs now seek to recover is for the loss sustained in consequence of the drop in the rate of exchange.

At the request of the plaintiffs the court, after having referred to the contract of affreightment, the drawing on the purchasers of the grain, the fluctuations in the value of the pound sterling, the knowledge of such fluctuations by persons engaged in the carriage of ocean cargoes, and the loss sustained by the plaintiffs by reason of the drop in the rate of exchange, charged the jury that, if they found that the practice mentioned was a general one, "followed by a large proportion of the shippers of grain from ports in the United States to England during the period in question; that it was a practice which was generally known to persons engaged in the carriage of ocean cargoes, and which was known, or should have been known, to the officers and agents of the defendant engaged in such business; that it was known to the agents of the defendant engaged in such business, or should have been reasonably contemplated by them, that a delay in the shipment of the plaintiffs' goods would result in a delay in the sale of a draft drawn upon England, and would, in all probability, result in a change in the value in dollars of the pound sterling, so that in actual result the plaintiffs would, because of the delay, receive as the price of their merchandise less dollars than they would have received had there been no delay; and that the practice of selling grain in England for pounds sterling was so general that this loss was equivalent to a decline in the market price of the merchandise, even though you find that there were other methods of financing shipments of grain in use during the period in question—then unless you find for the defendant under instruction No. 5 granted in its behalf, you should give a verdict in favor of the plaintiffs," etc. Instruction No. 5 has no bearing on the question we are now considering.

[1] We must assume that the jury found that those facts existed, for they returned a verdict for the plaintiffs. Without reference to whether or not the testimony warranted them in doing so, were the facts sufficient to establish that there was a practice upon the subject, within the meaning of the law, among the grain shippers. The word "practice" is a synonym for "usage" and "custom," and it is so treated generally in the law books, though there is a distinction between a usage and a custom. A lawful custom is a part of the common law, while a lawful usage, "proved and shown to affect both parties, may be described as the law of their case." Nicoll v. Pittsvein Coal Co. (C. C. A.) 269 Fed. 968, 971, citing Williston on Contracts, § 648. But what the plaintiffs are insisting upon here is a trade usage or custom, and it is governed by the law applicable to that subject. We

therefore come to consider what elements are necessary to a valid usage of trade.

[2] The Supreme Court of the United States, speaking of a usage as it relates to banks, said:

"But, to constitute a usage, it must apply to a place, rather than to a particular bank. It must be the rule of all the banks of the place, or it cannot, consistently, be called a usage." Adams v. Otterback, 15 How. 538, 545 (14 L. Ed. 805).

Before a custom or usage can acquire the force of law, it must appear that it is general and uniform in the business to be affected by it, and that it has been peaceably acquiesced in without dispute for a long period of time. Southern Indiana Express Co. v. United States Express Co. (C. C.) 88 Fed. 659, 664. A custom must be general among the dealers. Oelricks et al. v. Ford, 23 How. 49, 61, 16 L. Ed. 534. If the proof leaves the custom uncertain, either as to the fact or as to its effect on the matter with which it is related, it is void as a custom. It must be certainly shown to be the general usage of the trade at the port to which it relates. Minis v. Nelson (C. C.) 43 Fed. 777, 779. It must be definite, uniform, and well known, and should be established by clear and satisfactory evidence. Bowling v. Harrison, 6 How. 248, 259, 12 L. Ed. 425, cited in The Gualala, 178 Fed. 402, 405, 102 C. C. A. 548. In Continental Coal Co. v. Birdsall, 108 Fed. 882, 885, 48 C. C. A. 124, coal dealers in Baltimore testified that a certain custom existed at the port of Baltimore with respect to the effect of strikes at the mines upon charterers, but none of them knew of an instance where a charterer had been so affected. The court held that this was not evidence of a custom, because it failed to show that it was notorious and well defined. Judge Sanborn, of the Eighth Circuit, speaking for the court, said:

"A custom has the force of law, and furnishes a standard for the measurement of many of the rights and acts of men. It must be certain, or the measurements by this standard will be unequal or unjust. It must be uniform; for, if it vary, it furnishes no rule by which to mete. It must be known, or must be so uniform and notorious that no person of ordinary intelligence who has to do with the subject to which it relates, and who exercises reasonable care, would be ignorant of it; for no man may be justly condemned for the violation of a law or a custom which he neither knows nor ought to know. In short, a binding custom must be certain, definite, uniform, and known, or so notorious that it would have been known to any person of reasonable prudence who dealt with its subject with the exercise of ordinary care."

In the case before him two witnesses had testified to the existence of the custom, and that they practiced it. Five witnesses said that none of them knew or followed the alleged custom. Commenting on this the learned judge declared that the testimony showed the custom was not uniform, and hence was not binding. Chicago, Milwaukee & St. Paul R. Co. v. Lindeman, 143 Fed. 946, 949, 75 C. C. A. 18.

[3, 4] As we have seen, the trial court, in the case before us, instructed the jury that if the practice referred to was generally "followed by a large proportion of the shippers of grain," it was valid. Nothing was said about it being certain and uniform, or that "it must be the rule of all" the shippers. It could not be uniform among

the shippers, if the practice was followed by only a "large proportion" of them. It is not enough if it be confined to a part only of such persons. It must be the usage of all. Adams Case, supra. Of course, it is not necessary that every one engaged in the business to which it applies should always follow it (Hewlett v. Burrell, 105 Fed. 80, 44 C. C. A. 362), but it must be recognized by all as a custom of the business (Minis v. Nelson, supra). Indeed, the trial court told the jury that they could find the custom existed even though they also found that there were other methods of financing shipments of grain in use during the period in question. This is in direct violation of the rule of uniformity, for, in the language of Judge Sanborn, "if it [the custom] vary, it furnishes no rule by which to mete." We think the court erred in the respects mentioned, and that the facts found did not establish a valid usage of the shippers of grain.

[5] Even if the facts did establish a usage binding upon the shippers of grain, it does not follow that knowledge of the usage was imputable to the defendant at the time the contract of carriage was made. The business of shipping grain is quite different from that of carrying it. The defendant knew nothing about the contract which the shippers had with the purchasers, and had no actual knowledge of the shippers' method of doing business. It did not know whether plaintiffs sold the grain to be paid for in pounds sterling or in dollars. If sold to be paid for in the latter, there would have been no loss by reason of the drop in the rate of exchange.

[6] We know judicially that the defendant was engaged in carrying many different kinds of freight, and for persons engaged in widely different lines of business.

[7] To charge it with constructive knowledge of the methods of business pursued by each shipper in making his contracts of sale and collecting the purchase price would be unreasonable, and a usage which is not reasonable is not binding. See cases supra. In Great Western Elevator Co. v. White, 118 Fed. 406, 56 C. C. A. 388, it was held that:

"Knowledge of the customs sought to be proved, being peculiar to a particular business, must be first brought home to the party sought to be charged, where, as in this case, the party to be charged was engaged in a separate and distinct line of business. Whatever may be the rule as to presumptive notice of a custom or usage in the case of parties engaged in the same business, clearly no such presumption can be indulged in where the party to be charged is engaged in a separate line of business."

To the same effect see Eames v. Claflin Co., 239 Fed. 631, 152 C. C. A. 465, which cites and approves the White Case; also Van Hoesen v. Cameron, 54 Mich. 609, 20 N. W. 609, and Patterson v. Crowther & Boone, 70 Md. 124, 129, 16 Atl. 531.

[8, 9] It was necessary, therefore, to bring knowledge of this custom home to the defendant, and the instruction, in so far as it said that the defendant might be held liable if it "should have known" of the custom, is erroneous. The jury was not told what facts or circumstances would warrant them in finding that the defendant should have known. They were left to speculate without any definite guide. If the usage was of great notoriety, knowledge might be presumed;

but it was necessary to prove knowledge, whether by direct proof or by circumstances. See Patterson v. Crowther, supra. Of course, if knowledge of the usage was not possessed by the defendant at the time when the contract was made, it could not have been within its contemplation.

Instruction No. 2, requested by the defendant, said in effect that, if the jury found that the defendant had no actual knowledge of the existence of the practice relied on, their verdict should be for the defendant. This is in conformity with the views herein expressed, and should have been given. As to instructions 3 and 4, also requested by the defendant, we think they were properly refused, because they do not say what should be the result if the defendant knew of the particular method pursued by the plaintiffs. With this element properly embodied, they would state the law correctly.

[10, 11] Since the case may be tried again, we notice certain infirmities appearing in the declaration. It is a rule of pleading that facts should be pleaded positively and directly, and should not be left to be deduced by argument and inference. Burkett v. Griffith, 90 Cal. 532, 27 Pac. 527, 13 L. R. A. 707, 25 Am. St. Rep. 151; McPhail v. People, 160 Ill. 77, 82, 43 N. E. 382, 52 Am. St. Rep. 306; 21 R. C. L. §§ 9, 11, pp. 445, 448. The declaration does not allege directly a sale of the barley, nor does it state that the practice or usage on which the action is based existed among shippers of grain at the ports of the United States, or, at least, at the port of New Orleans, where the contract of shipment was executed, or that the defendant was familiar with it at the time the contract was made. As we have said, it is not enough that the usage was generally in force among the shippers, and that it should have been known to the defendant.

So far as the testimony is concerned, we express no opinion with respect to its sufficiency, but leave that to be determined at the next trial, if there be one, in the light of the principles which we have announced.

For the foregoing reasons, we think the case should be reversed, with costs; and it is so ordered, and the lower court is directed to grant a new trial in accordance with the views expressed in this opinion.

Reversed and remanded.