ARDAN S. S. Co., Limited, *v.* THEBAND *et al.*[1]

(*District Court, S. D. New York.* May 29, 1888.)

1. SHIPPING—CHARTER-PARTY—BILL OF LADING.
    As between ship-owner and charterer shipping his own goods, the charter controls the bill of lading where there is difference between them.

2. SAME—LIBERTY TO ASSIST OTHER VESSELS.
    A clause in a bill of lading giving the vessel "liberty to call at any port or ports for whatever purpose, * * * and to tow and assist vessels in all situations," when the charter gives no such liberty, will not warrant, as against the charterer, a material deviation to assist a disabled vessel.

3. SAME.
    Liberty given a vessel to call "at any port or ports," or to tow and assist vessels "in all situations," refers to ports along the course of the voyage specified, or vessels met with in the ordinary course of such voyage. Hence, where a vessel after loading proceeded 40 miles directly out of her course to take in tow a disabled vessel, and was detained by such towage about seven days, *held* an unjustifiable deviation, rendering the vessel liable to the charterer for the increased premiums of insurance, and interest on his goods during the delay.

In Admiralty. Action for balance of freight.
*Whitehead, Parker & Dexter*, for libelant.
*Wing, Shoudy & Putnam*, for respondents.

BROWN, J. In November, 1887, the respondents, by written charter, agreed to furnish the British steam-ship Ardanach a full cargo of hemp in bales from Progresso, Mexico, to New York. On the 23d or 24th of November a cargo was accordingly shipped at Progresso, a portion of which was to be delivered to the respondents. A bill of lading therefor was signed by the master, which reserved "liberty to call at any port or ports for whatever purpose, to sail with or without pilots, and to tow and assist vessels in all situations." The charter did not contain any such reser-

vation. After loading, the steamer proceeded in a south-westerly direction to Celestuns, some 40 miles directly away from her course to New York, in order to take in tow a disabled vessel, which she towed thence to Key West. The ordinary passage from Progresso to New York would be about seven or eight days. In consequence of going to Celestuns, and of the detention caused by the towage, the voyage occupied 14 days, which is not unreasonable, allowing for the towage. She arrived safely in New York; but the respondents, under the terms of their insurance, were compelled to pay an extra premium by reason of the detention caused by the towage, amounting to $400; and the interest on the invoice during the delay was $72.22. The respondents paid the freight, less these amounts, which they claimed were an offset. This libel was filed to recover the balance of freight alleged to be due.

It has been repeatedly held that, as between the parties to a written charter, the charter controls the bill of lading, where there is any difference. Pars. Shipp. & Adm. 286; *The Chadwicke,* 29 Fed. Rep. 521, and cases there cited; *Leduc* v. *Ward,* 20 Q. B. Div. 475, 479. As this charter contains no such provision as that in the bill of lading, on which alone the libelant relies for justification in departing from the ordinary course of the voyage, it is doubtful whether that clause has any force as against the respondents. It imposes on them additional risks, which the charter did not impose. But the master had no authority to impose any new terms or conditions of the transportation which the charter did not contain; and the mere issuing of a bill of lading upon loading a charterer's goods is not treated, as between the parties, as evidence of any new contract, or as so intended; but as designed only as a memorandum of a shipment under the charter. Aside, however, from the foregoing consideration, the scope of clauses in bills of lading like that in the present case has been repeatedly the subject of adjudication since the time of Lord MANSFIELD. In *Gairdner* v. *Senhouse,* 3 Taunt. 16, 22, liberty was reserved to touch and stay at any port or ports whatever, and it was held that such language must be confined to ports in the course of the voyage specified. The same was decided in *Solly* v. *Whitmore,* 5 Barn. & A. 45, and in *Williams* v. *Shee,* 3 Camp. 469. In the very recent case of *Leduc* v. *Ward,* 20 Q. B. Div. 475, upon a bill of lading allowing "liberty to call at any ports in any order" upon a voyage from Fiume to Dunkirk, proceeding to Glasgow was held in the court of appeal to be an unjustifiable deviation. Lord ESHER says:

"In the present case liberty is given to call at any ports in any order. It was argued that that clause gives liberty to call at any port in the world. Here, again, it is a question of the construction of a mercantile expression, used in a mercantile document, and I think that as such the term can have but one meaning, namely, that the ports, liberty to call at which is intended to be given, must be ports which are substantially ports which will be passed on the named voyage. Of course such a term must entitle the vessel to go somewhat out of the ordinary track by sea of the named voyage, for going into the port of call itself would involve that. To 'call' at a port is a well-known sea term. It means to call for the purpose of business generally, to take in or unload cargo, or to receive orders. It must mean that the vessel may stop at

the port of call for a time, or else the liberty to call would be idle. I believe the term has always been interpreted to mean that the ship may call at such ports as would naturally and usually be ports of call on the voyage named. If the stipulation were only that she might call at any ports, the invariable construction has been that she would only be entitled to call at such ports in their geographical order; and therefore the words 'in any order' are frequently added. But in any case it appears to me that the ports must be ports substantially on the course of the voyage. It follows that when the defendant's ship went off the ordinary track of a voyage from Fiume to Dunkirk, to a port not on the course of that voyage, such as Glasgow, there was a deviation, and she was then on a voyage different from that contracted for, to which the excepted-perils clause did not apply; and therefore the ship-owners are responsible for the loss of the goods." Pages 481, 482.

The additional clause in the bill of lading in the present case, "to tow and assist vessels in all situations," is used in immediate connection with the "liberty to call at any port or ports, for whatever purpose," and seems· to me manifestly subject to the same necessary implications. It was intended to authorize assistance to vessels needing help in all situations that might be met with in the ordinary course of the voyage. It was not designed to authorize, and did not justify the vessel in proceeding, after she was loaded, as was done in this case, 40 miles directly away from her port of destination, and away from the ordinary course of the voyage. Her doing so added materially to the risks of the voyage, and seems to me a deviation wholly foreign to the purpose and to the well-known construction of such clauses in bills of lading. Cases of slight departure, like that of *Stuart* v. *Navigation Co.*, 32 Law T. (N. S.) 257, for the salvage of vessels in imminent danger and distress, are not applicable to a commercial contract of towage of this kind, which would, if justified, subject cargoes, without limit, to the speculative ventures of masters. The offset is allowed, and judgment must therefore be for the respondents, with costs.