## THE GUALALA.†

(Circuit Court of Appeals, Ninth Circuit. April 4, 1910.)

No. 1,708.

1. CUSTOMS AND USAGES (§§ 6, 19*)—CERTAINTY AND UNIFORMITY.

A custom or usage as to the stowage of cargo, to be available to a ship-owner as a defense to a suit for failure to deliver cargo which was lost by reason of the place and manner of stowage, must be definite, uniform, and well known, and must be established by clear and satisfactory evidence.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 5, 46; Dec. Dig. §§ 6, 19.*]

2. SHIPPING (§ 120*)—CARRIAGE OF GOODS—LIABILITY FOR LOSS OF CARGO.

In the absence of a valid contract to the contrary, the owner of a ship carrying cargo for hire is liable at common law for a failure to deliver cargo from whatever cause except the act of God or a public enemy.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 440–466; Dec. Dig. § 120.*]

3. SHIPPING (§ 123*)—LIABILITY FOR LOSS OF CARGO—PERILS OF THE SEA—STOWAGE.

A shipowner is not exonerated from liability for a failure to deliver cargo on the ground that it was lost through perils of the sea, where it was stowed on the deck, and there is no proof that the place or manner of stowage was sanctioned by general usage, or that they did not contribute to the loss.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 454, 455, 466; Dec. Dig. § 123.*

Loss by perils of the sea, see notes to The Dunbritton, 19 C. C. A. 465; Southerland-Innes Co. v. Thynas, 64 C. C. A. 118.]

Appeal from the District Court of the United States for the Northern District of California.

Suit in admiralty by Notley Brothers, a corporation, against the steam schooner Gualala, the Gualala Steamship Company, claimant. Decree for libelant, and claimant appeals. Affirmed.

W. F. Sullivan and I. F. Chapman, for appellant.

Charles Page, Edward J. McCutchen, and W. S. Burnett, for appellee.

Before GILBERT and MORROW, Circuit Judges, and HUNT, District Judge.

MORROW, Circuit Judge. Action in a cause of tort to recover damages for the nondelivery of 110,930 pounds of tan bark shipped on board the steam schooner Gualala at Shelter Cove in Humboldt county, Cal., in good order and condition, to be transported and delivered at the port of San Francisco.

The libel contains two counts. The first alleged the shipment of 226,880 pounds weight of tan bark and the failure to deliver 110,930 pounds thereof, to the damage of libelant in the sum of $740. The second count alleged the shipment of tan bark at the time and place set forth in the first count. It further alleged that when the schooner was out 40 miles from Shelter Cove, and opposite Ft. Bragg, in Humboldt

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied May 23, 1910.

county, the sea became rough and a gale arose and the schooner listed heavily, her engine room began to fill with water, and she was threatened with destruction; and thereupon, to avert such disaster, the master caused the lashings holding a part of the tan bark stored on deck to be cut, and the bark amounting to 110,930 pounds was jettisoned. The libelant claimed that this act resulting in a loss to it required of the schooner that she should make a general average statement, and that the other cargo, freight, and the schooner should contribute in general average, all of which the schooner had refused to do to the libelant's estimated damage in the sum of $600. It was alleged in this count:

"That said schooner at said time and for a long time prior thereto had been regularly engaged in the coastwise trade, and, in accordance with the custom then and during all of said times existing. had regularly carried cargo on her deck, and upon said voyage said tan bark was loaded on the deck of said schooner and lashed thereto."

The claimant of the schooner, answering the libel, admitted the shipment and short delivery of the tan bark alleged in the first count; denied the damage, or that it was liable therefor; but admitted the washing out of and from the deck lashings the 110,930 pounds of bark by reason of the very rough sea; alleging that at the time of the destruction of the tan bark the schooner was properly laden and the tan bark carefully and properly stowed and lashed aboard said schooner; and that the loss and destruction thereof was solely caused by the acts of God, peril of the seas, and dangers incident to navigation, and without any fault or neglect on the part of the master or the crew of said steam schooner. The claimant further alleged that, in accordance with the custom of the United States coastwise carrying trade, a large portion of the cargo of the steam schooner consisting wholly of tan bark was laden on the deck of said steam schooner and lashed thereto, and the said tan bark so laden and lashed was carried wholly at the risk of the shipper and owner thereof.

The claimant answered the second count by repeating the allegation that in accordance with the custom of the coastwise trade a large part of the cargo had been laden on the deck of the schooner and lashed thereto, and that the tan bark so laden and lashed was carried wholly at the risk of the shipper and owner thereof; denied that the deck load or any part thereof was jettisoned; alleging that the loss and destruction of the tan bark was caused by the acts of God, peril of the seas, and dangers of navigation, and without any fault or neglect on the part of the master or crew of said schooner; and denied liability for contribution in general average. The claimant with its answer filed a cross-libel seeking to recover freight on so much of the shipment as was delivered to libelant. The libelant answered the cross-bill admitting its liability to pay freight on the tan bark delivered, but claiming an offset for the nondelivery of the balance of the shipment.

Upon the trial the libelant failed to establish the facts alleged in the second count, but claimed that the evidence was sufficient to establish the liability of the vessel for the loss of the tan bark under the first count, and upon that count a decree was entered in favor of the libelant for $571.86.

The bill of lading or shipping receipt issued in this case is not in the record. In the appellee's brief there is a reference to a shipping receipt under which the tan bark was shipped on board the vessel; but its absence from the record does not appear to be material. The common-law liability of the common carrier is well defined, and, apart from express contract and certain exceptions, imposes upon him absolute responsibility for the safety of the goods while they remain in his hands. Carver on Carriage by Sea, § 2.

"By the settled law, in the absence of some valid agreement to the contrary, the owner of a general ship, carrying goods for hire, whether employed in internal, in coasting, or in foreign commerce, is a common carrier, with the liability of an insurer against all losses, except only such two irresistible causes as the act of God and public enemies." Liverpool & Great Western Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 437, 9 Sup. Ct. 469, 32 L. Ed. 788; The Folmina, 212 U. S. 354, 361, 29 Sup. Ct. 363, 364, 53 L. Ed. 546.

"In a proceeding to recover for the breach of the contract of affreightment, after the amount of damage has been established, the burden lies upon the carrier to show that it was occasioned by one of the perils for which he was not responsible." The Folmina, 212 U. S. 354, 361, 29 Sup. Ct. 363, 365, 53 L. Ed. 546.

"The burden of proof lies on the carrier, and nothing short of clear proof, leaving no reasonable doubt for controversy, should be permitted to discharge him from duties which the law has annexed." The Mohler, 88 U. S. 230, 233, 22 L. Ed. 485.

The claimant in this case alleged in its answer:

"That in accordance with the custom of the United States coastwise carrying trade, a large portion of the cargo of said steam schooner, consisting wholly of tan bark, was laden on the deck of said steam schooner and lashed thereto, and the said tan bark so laden and lashed was carried wholly at the risk of the shipper and owner thereof."

No evidence whatever was introduced tending to show that the shipper or owner by custom or otherwise assumed such risk; but in support of the first clause of this allegation the claimant introduced the evidence of the second mate, who testified that in his opinion the vessel was loaded in the "usual and customary manner." The testimony of the master was not obtained, but it was stipulated that if he had been present he would have testified "that the Gualala on the voyage in question was properly loaded." In further support of this allegation, claimant invokes the aid of that part of the second or salvage count of the libel alleging that said schooner at said time, and for a long time prior thereto, had been regularly engaged in the coastwise carrying trade, and, in accordance with the custom then and during all of said times existing, had regularly carried cargo on her deck; that upon the said voyage said tan bark was loaded on the deck of said schooner and lashed thereto.

The second mate testified that the lashing of the deck load was chain lashing of two chains; one fastened on each side of the vessel; the one end of each chain being made fast inside of the rail to a ringbolt, and the other end thrown over the tan bark to the middle, where the ends of the two chains were brought together and fastened with a screw turnbuckle. There were six chains on each side. The tan bark was piled up above the main deck about 14 or 15 feet.

As before stated, upon the trial the libelant failed to establish the facts alleged in the second or salvage count, and the cause of action on that count was abandoned by the libelant. Whether, under this state of the case, the claimant can avail himself of an allegation of that count of the libel in aid of his defense to the first count may be doubtful; but we need not dwell on that question. The allegation is that in accordance with the custom the schooner had regularly carried cargo on her deck. This might be true with respect to certain classes of merchandise and still not be true with respect to a cargo of tan bark on deck, stowed and piled up 14 or 15 feet high, as the tan bark was piled up on the deck of this schooner. If there was a custom or usage for such a stowage, it ought to have been clearly established and not left to inference.

"A usage, to be binding, should be definite, uniform, and well known. It should be established by clear and satisfactory evidence, so that it may be justly presumed that the parties had reference to it in making their contract." Bowling v. Harrison, 47 U. S. 248, 259, 12 L. Ed. 425.

There is no direct proof in this case to show that the custom or usage of the trade sanctioned such a stowage on deck as has been described, whatever may have been the custom with respect to carrying cargo on deck, and we do not think the allegation of the second or salvage count of the libel, if admitted, could help the claimant's case in the least. In the absence of such proof, we cannot say that the stowage was in accordance with the customs of the coastwise trade.

The evidence introduced by claimant in support of the defense that the loss of the tan bark was solely caused by a peril of the sea and dangers incident to navigation is equally unsatisfactory. The second mate testified that at the time of the accident there was a moderate northwest wind. The sea was heavier than the wind because the sea was not running the same way. The sea was rolling in from off-shore. When asked what he saw with reference to the loss of the tan bark, he testified that he was going down below to call his superior officer; when he came on deck, the schooner was listing over, and the captain was giving orders to heave her to. In the meantime, when they were heaving to, she lost the tan bark. The schooner went down on her beam ends. The sea took the tan bark. The swell was keeping on rolling her over. The next one rolled her a little further, and the bark was just washed out. Then she listed over to the starboard side, and the bark went over the same way on the off-shore side. The rolling of the vessel was on account of the heavy swell that was running. He was surprised when the vessel went on her beam ends.

The stipulated testimony of the master was:

"That she left port on an even keel, and when she got off about abeam of Ft. Bragg, on account of the unusual heavy wind and sea, I was about to heave to to ride out a gale, when this accident occurred to her and part of the deck load of the tan bark was lost on the starboard side and part on the port side, on account of the wind and sea washing it off."

The libelant called A. G. McAdie, professor of meterology in the United States Weather Bureau, who testified that on Sunday, August 25, 1907 (the day the bark was lost)—

"beginning with the forenoon the weather was foggy in the morning along the northern coast of California, with a light northwest wind running down from Eureka to Point Reyes, foggy at both places with wind bearing from four to six miles an hour; the pressure barometer running from 29.96 to 30.06, and temperature 54. In the afternoon it was clear at both places and presumably along the entire coast, that section of the coast from here to Eureka, with light northwest winds on the northern portion, and moderately strong northwest winds in the Point Reyes section. The wind velocities were 8 miles at Eureka, which is a light wind for a summer afternoon at that point, and 34 miles an hour at Point Reyes, which is only a moderate wind for Point Reyes upon a summer afternoon. At the Farallones it was northwest and clear 24, which is also light. All points along the coast, it was, in my opinion, a clear and rather pleasant Sunday afternoon, with moderate northwest winds. The weather was presumably, at Ft. Bragg, clear, with moderate northwest winds."

George W. Notley, a son of Mr. Notley who was president of the libelant company, was called, and testified that he saw the vessel leave Shelter Cove; that she was not on even keel; she had a list to port. "I had a conversation with the captain of the vessel concerning her loading. The captain came along the wharf, and I said to him, 'That looks pretty bad there in the back.' He says, 'Yes.' He called up the mate, and he says: 'Load that in closer. You are getting out so far that there are two chances we will lose that now.' After this conversation the mate loaded it in closer at the top." Describing the deck load, the witness said:

"It was closer to the stern. It was right alongside of the house and for about a foot above the rail was out like it ought to be. Then it kept coming out. All at once it come out about a foot or so in the tan bark and left it uneven very much. There was a foot extended anyhow when they put the lashing under it. The captain said not to put the lashing under it, but to put it right on so as to hold it best as possible."

The witness, describing the effect of such a loading, said:

"If it is all even, it does not have such a chance of slipping; if it is not even, and it slides a little bit, and once starts, it being out further, it gives it a shorter distance, and when it gets up halfway on the bark it will tip."

This testimony, instead of showing that the deck load of bark was lost by a peril of the sea, shows rather that the bark was lost overboard by reason of its bad stowage on deck, or bad seamanship in heaving the vessel to, or both. There was certainly no proof that the manner in which the bark was stowed on deck did not contribute to its loss. Nor was there any proof that the seamanship in heaving to did not contribute to the disaster.

"Goods, though lost by perils of the sea, if they were stowed on deck without the consent of the shipper, are not regarded as goods lost by the act of God within the meaning of the maritime law, nor are such losses regarded as losses by perils of the sea which will excuse the carrier from delivering the goods shipped to the consignee unless it appears that the manner in which the goods were stowed is sanctioned by commercial usage, or unless it affirmatively appears that the manner of stowage did not, in any degree, contribute to the disaster; that the loss happened without any fault or negligence on the part of the carrier; and that it could not have been prevented by human skill and prudence, even if the goods had been stowed under deck, as required by the general rules of the maritime law." The Delaware, 81 U. S. 579, 598, 20 L. Ed. 779.

The burden was upon the claimant to show clearly that the vessel was without fault. This it did not do. In this state of the evidence, the decree in favor of the libelant was properly awarded.

Decree affirmed.