ROSENBERG BROS. & CO. v. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION. CALIFORNIA WINE ASS'N v. SAME. S. L. JONES & CO. v. SAME.

(District Court, N. D. California, S. D. September 23, 1925.)

Nos. 17692, 17693, 18046.

1. Shipping ⊂⊃125—Deviation held not within authority of liberty clause.

For vessel, sailing from San Francisco with shipments for Cardiff, Wales, Rotterdam, Holland, and Hamburg, Germany, to pass Cardiff and Rotterdam and proceed towards Hamburg, 750 miles beyond Cardiff, and 250 miles beyond Rotterdam, intending to visit the three ports in the reverse of their geographical order, principally for convenience of loading return cargo, *held*, as to shipments for Cardiff and Rotterdam, an unauthorized deviation, notwithstanding broad liberty clause, in bills of lading, to touch at any port or ports in any order, "in or out of the customary route"; Hamburg not being a port lying substantially on course of voyage from San Francisco to Cardiff or Rotterdam.

2. Customs and usages ⊂⊃3—Essentials for "binding custom or usage" stated.

Custom or usage, to be binding, must be definite, uniform, and well known, and be established by clear and satisfactory evidence, and shown to be long-established, reasonable, and generally acquiesced in.

3. Customs and usages ⊂⊃19(3) — Evidence held insufficient for finding of practice of vessels calling at ports out of geographical order.

Evidence *held* insufficient for finding of practice of vessels in European Pacific trade to call at European continental ports out of their geographical order.

4. Evidence ⊂⊃413 — Evidence of shipper's knowledge of proposed itinerary, unauthorized by bill of lading, inadmissible.

Under rule that parol evidence is inadmissible to vary terms of written contract, evidence that shipper knew or ought to have known of proposed itinerary of ship, not authorized by settled meaning of deviation clause in bill of lading or by well-established custom, is objectionable.

5. Shipping ⊂⊃131—Unauthorized deviation deprives carrier of benefit of insurance clause.

Unjustified deviation by ship vitiates contract of carriage, and deprives carrier of benefit of insurance clause in bill of lading.

6. Shipping ⊂⊃132(1)—Shipper, to sue carrier after deviation, need not have been deprived of right against insurer.

It is not a condition to suit by shipper against carrier for loss, after unjustified deviation by ship, that shipper shall have been deprived of his right against insurer.

7. Admiralty ⊂⊃34—Suit by shipper against Fleet Corporation not barred or affected by Suits in Admiralty Act.

Suits by shipper for loss of goods against United States Shipping Board Emergency Fleet Corporation is not barred or affected by Suits in Admiralty Act (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼*l*).

8. Admiralty ⊂⊃34—Relative to laches, admiralty will follow state statute of limitations.

Court of admiralty will by analogy, relative to question of laches, follow statute of limitations of state in which it is sitting.

9. Shipping ⊂⊃131—Value at destination measure of damages for failure to deliver.

Measure of damages for failure to deliver cargo is its market value at port of destination at time vessel should have arrived.

In Admiralty. Suits by Rosenberg Bros. & Co., by the California Wine Association, and by S. L. Jones & Co., against the United States Shipping Board Emergency Fleet Corporation. Decrees for libelants.

See, also, 295 F. 372.

J. M. Mannon, Jr., Farnham P. Griffiths, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for libelants.

Ira S. Lillick and Chalmers G. Graham, both of San Francisco, Cal., for respondent.

KERRIGAN, District Judge. These three cases, tried together, are suits brought in the names of the shippers and owners of cargo lost on the steamship West Aleta, when that vessel stranded on Terschelling Island, more than five years ago.

The West Aleta left San Francisco with a full cargo on January 6, 1920. Libelants' shipments were destined for Cardiff, Wales, and Rotterdam, Holland, and consisted of rice, nutmegs, and 15,000 barrels of wine and brandy. Bills of lading were issued in the usual form, in one case naming San Francisco as the port of departure and Cardiff as that of destination, and in the other cases San Francisco and Rotterdam as such respective ports. In none of them was any reference made to Hamburg, Germany; but, inasmuch as each of the libelants had consigned a shipment to that port, they had actual knowledge that the vessel intended to call there.

In each case the opening clause of the bill of lading reads as follows: "Received in apparent good order and condition * * * at San Francisco, * * * to be transported by the ship West Aleta, * * * *with leave* * * * *to touch at any port or ports in any rotation or order, in, or out of, the customary route, and to call at any port or ports more than once unto the port* of Cardiff (Rotterdam). * * * "

Stamped on the face of the instrument is a clause reserving liberty to deviate for trial trips, and in its main body a clause has been inserted to permit deviations "for the purpose of saving life or property." No other provision is made for deviation from the direct route between San Francisco and the destination named, which in each case, as stated, was Rotterdam or Cardiff.

For reasons of her own, not amounting to necessity, after proceeding safely through the Panama Canal, and across the Caribbean Sea and the Atlantic Ocean to the entrance to Bristol Channel, on which Cardiff is situated, the West Aleta proceeded through the Straits of Dover into the North Sea. After passing the entrance to Rotterdam Harbor, when about 100 miles beyond that point, she stranded on Terschelling Island, and with her cargo became a total loss. Admittedly, she was on her way to Hamburg, a port 750 miles beyond Cardiff and 250 miles beyond Rotterdam, intending to visit those three ports in the reverse of their geographical order.

At the time of the wreck the North Sea at the mouth of the Elbe was still dangerous for navigation, because of the presence of floating mines. The captain of the West Aleta appears to have lost his vessel in an endeavor to avoid areas containing such mines, and to have been guilty of faulty navigation in doing so. For this, of course, no claim can be made; but for his failure to discharge the Cardiff and Rotterdam cargoes before passing those ports libelants seek to recover their values, relying on the familiar doctrine of deviation to create an absolute liability in their favor.

It is clear that such a liability must be established if a recovery is to be allowed, for the real parties in interest herein are cargo insurers, who have made full payment of losses under their policies, and now stand subrogated to the claims of the insured. Each of the bills of lading contains a "benefit of insurance" clause in favor of respondent. Before, however, it can avail itself of this defense, it has cast upon it the burden of explaining the deviation above described from the natural, direct, and ordinary route.

[1] Respondent's first contention is that under the "liberty to call" or "deviation" clause above set forth, the West Aleta had a right to make the voyage which she was pursuing at the time of her loss. While it it true that the right of deviation given by this clause is very broad, it nevertheless is not unlimited. The law has, in fact, attached to it a fixed and certain meaning, older than the oldest American court of admiralty, which limits its application to ports substantially on the course of the voyage described, *between its termini and before the port of destination.*

Regarding the rule as settled by earlier cases, more than a century ago Lord Mansfield held a general leave "to touch and stay at any ports and places whatsoever, without being deemed a deviation," must be confined to ports "in the course of the voyage" to the destination named in a policy of insurance. "Though at the trial I was struck with the largeness of these words," said that eminent judge, "as giving liberty to the ship to go any where she pleases, to any island, in any course, it must be confined to the voyage insured; that is, to some port in the course of the voyage to (the ports of destination); *otherwise, I do not see where the voyage is to end.* They might make it last two years, * * * and the larger the words are the more necessary is this construction, else the ship might trade and barter without any termination." Gardner v. Senhouse, 3 Taunt. 16, 128 Eng. Repr. 7. (Italics mine.)

I have been referred to no case in this country which impairs the force of this reasoning. It was accepted in Smith v. United States Shipping Board Emergency Fleet Corporation (D. C.) 2 F. (2d) 390, and appears to me to be supported by an almost unbroken line of American decisions. Ardan S. S. Co. v. Theband (D. C.) 35 F. 620; Hurlbut v. Turnure (D. C.) 76 F. 587, affirmed in (C. C. A. 2) 81 F. 208, 26 C. C. A. 335; Swift & Co. v. Furness, Withy & Co. (D. C.) 87 F. 345; The Blandon (D. C.) 287 F. 722; The Willdomino (C. C. A.) 300 F. 5.

In Austrian Union S. S. Co. v. Calafiore (C. C. A. 5) 194 F. 377, 114 C. C. A. 295, a vessel on a voyage from Palermo, Italy, to New Orleans, stopped en route at Tampa, Fla., to take on cargo for the return voyage. As a result of the delay libelant's cargo of lemons was damaged. A cause in the bill of lading gave the carrier "liberty * * * to proceed to and stay at any ports or places whatsoever (although in a direction contrary to, or out of, or beyond, the route to said port of discharge), once or oftener, in any order, backwards or forwards, for the purpose of receiving and for delivering coals, cargo, or passengers, *or for any other purpose;* and all such ports * * * shall be deemed within the intended voyage." A

broader right of deviation can scarcely be conceived; yet it was held, and I think rightly, that the ship had not stopped at Tampa for the purposes of the voyage, but for those of *another* voyage, to be undertaken after New Orleans was reached, that such action was unquestionably beyond the contemplation of the shippers at the time the bill of lading was signed, and that the carrier therefore was liable, although, as it will be observed, Tampa was on the course of the voyage named in the bill of lading. This is perhaps the extreme example of Lord Mansfield's rule of construction that "the larger the words are the more necessary" does strict construction become. Gardner v. Senhouse, supra.

In the present case respondent's testimony indicates that the principal reason why the West Aleta was ordered to take the course which she followed was convenience of the vessel in loading her return cargo.

Smith v. United States Shipping Board Emergency Fleet Corporation, supra, is very much in point here, because it involved claims for the loss of other cargo on the same ship and voyage which gave rise to these suits. The only distinction to be made is that there all of the cargo was shipped to Rotterdam; whereas, in the cases at bar, the greater part of it (in point of value) was destined for Cardiff, and the deviation attempted was greater by 1,000 miles than in that case. Judge Augustus Hand concluded there that "the permission 'to touch at any port or ports in any rotation or order, in or out of the customary route,' related to stopping in ports on the way to Rotterdam, either in or out of the geographical order."

This, counsel argue, absolutely disregards the phrase "out of the customary route," because without the use of these words a ship might touch at any such port, and such a construction deprives them of all meaning. That the words quoted may be redundant to the power which they purport to enlarge, without in fact enlarging it, must of course be granted. The books are full of cases in which language has fallen short of the meaning which it was intended to express. Certainly the entire clause must be construed with the utmost strictness against the carrier (Poor on Charter Parties and Ocean Bills of Lading, § 69; The Caledonia, 157 U. S. 124, 137, 15 S. Ct. 537, 39 L. Ed. 644; Pacific Coast Steamship Co. v. Bancroft-Whitney Co. [C. C. A. 9] 94 F. 180, 187, 36 C. C. A. 135), and its meaning may not

be extended further than its terms can reach.

Baldly stated, it gives permission "to touch at any port or ports * * * in or out of the customary route * * * unto the port of Cardiff (Rotterdam). * * * " The phraseology is not "unto, beyond, and back to the port of Cardiff," but simply "unto the port of Cardiff." To have held that there was no deviation from the agreed voyage, it would have been necessary for Judge Hand to adopt an unduly liberal, not to say strained, construction of this language.

The general attitude, both of the English and American courts, toward exemptions such as the one herein, may be seen from a résumé of the decisions. It has been held that a carrier cannot escape its obligation by reserving liberty for its vessel to go "to any port in the world," or "to any ports or places whatever" (Gardner v. Senhouse, supra; Clason v. Simmonds, reported 6 T. R. 531, 101 Eng. Repr. 686; Ardan Steamship Co. v. Theband, supra), whether "in any order" (Le Duc v. Ward, 20 Q. B. D. 475; The Wells City [D. C.] 57 F. 317, affirmed in [C. C. A. 2] 61 F. 857, 10 C. C. A. 123), or "in any rotation" (Margetson v. Glynn, [1892] 1 Q. B. 337, [1893] A. C. 351), or whether there be added the phrase "whether in geographical order or not" (White v. Grenada Steamship Company, 13 Times L. R. 1), or the words "although in a direction contrary to, out of, or beyond the route to said port of discharge" (Austrian Steamship Company v. The Calafiore, 194 F. 377, 114 C. C. A. 295) or those here used, "in or out of the customary route" (The Willdomino [C. C. A.] 300 F. 5; Smith v. United States Shipping Board Emergency Fleet Corporation, supra).

The rule to be deduced from these cases is that, in the absence of unambiguous language to the contrary, a deviation clause invariably must be construed to have reference to a particular voyage between the ports of departure and destination named in a policy or a bill of lading, and to have no application to any port or ports not naturally and usually ports of call on the proposed voyage. Le Duc v. Ward, supra. Addition of the words "in or out of the customary route" may broaden a carrier's right to deviate; but they will not be construed to authorize the initiation of a new voyage before an old one is completed. Austrian Steamship Company v. The Calafiore (C. C. A. 5) 194 F. 377, 114 C. C. A. 295. As

was stated by Lord Justice Bankes in the English Court of Appeal less than a year ago, "the decision always has been that the general language of which these cases are illustration must be read as controlled by the governing object of the contract, namely, the prosecution of the named voyage. * * *" United States Shipping Board Emergency Fleet Corporation v. Bunge and Borne, Ltd., 41 T. L. R. 73, affirming 40 Times L. R. 541 (K. B. D.).

The only question presented, therefore, is one of fact: Whether Hamburg is a port which lies substantially on the course of a voyage from San Francisco to Cardiff or Rotterdam; and this question it is impossible to answer in the affirmative.

[2, 3] The next point made by respondent is that there is a well-known and fully recognized custom of the port of San Francisco for vessels engaged in the so-called European Pacific service, with ports of discharge in the Hamburg-Bordeaux range, to call at those ports (including Hamburg, Rotterdam, and Cardiff) in any order, without regard to their particular geographical location. In passing on this contention, Judge Hand said as follows: "I cannot say that the business usage, whereby no more than 18 ships, at most, of the respondent had usually proceeded from the Pacific Coast to Hamburg before discharging at Rotterdam, and had only done this for a period of about a year, can be regarded as a general and uniform custom having the force of law, of which shippers should take notice." Smith v. United States Shipping Board Emergency Fleet Corporation (D. C.) 2 F.(2d) 390, 391.

It is elementary that a custom or usage, to be binding, must be definite, uniform, and well known. Furthermore, it must be established by clear and satisfactory evidence, so that it may be justly presumed that the parties had reference to it in making their contract. Bowling v. Harrison, 47 U. S. (6 How.) 248, 12 L. Ed. 425; The Gualala (C. C. A. 9) 178 F. 402, 102 C. C. A. 548. It must, in addition, be shown to be long-established, reasonable, and generally acquiesced in (Sweet v. Leach, 6 Ill. App. 212); requirements which are sustained by all of the authorities. (3 Jones on Evidence, § 462). If the proof leaves it uncertain, either as to the fact or as to its effect on the matter with which it is related, it is void. United States Shipping Board Emergency Fleet Corporation v. Levensaler, 290 F. 297, 53 App. D. C. 322.

Proof was made at the trial that the Euro-

pean Pacific Line did not commence operations until 1919. During the World War there had been no such service at all. A list of sailings, which was produced by respondent, shows that there were not 18 vessels engaged in it, as the court was led to believe in the West Aleta case, but only 12. The Effingham, which left San Francisco on December 17, 1919, went to Hamburg before calling at London and Liverpool, but at the time the West Aleta sailed had not yet crossed the Atlantic. The Orani, which sailed on October 29, 1919, also departed from the geographical order of call, but touched only at ports in the United Kingdom. The Cockaponset commenced its voyage only 9 days before the departure of the West Aleta. Of the 9 other vessels listed, 3 had but one port of destination, and 6 called at several ports, strictly in their natural geographical order.

On such evidence as this, it is impossible to base a finding that there was a practice for vessels in the European Pacific trade to call at European continental ports out of their geographical order. Its tendency, if it has one, is to prove an opposite practice. The burden was on respondent to establish by clear and satisfactory evidence a custom at and prior to the time at which arrangements were made with respect to the West Aleta's cargo, and evidence of the practice subsequent to that time is clearly incompetent. No usage, as distinguished from a custom, has been shown; for to be legally recognized a usage must be proved to have been assented to by the parties, and to have been so notorious as to be presumed to have been assented to by them. 2 Williston on Contracts, 1276. The alleged custom invoked by respondent, therefore, has not been established by the evidence.

[4] Nor is the point well taken that libelants knew of the intention of the operators of the West Aleta to send her to Hamburg before having her proceed to Rotterdam and Cardiff. If there is any rule of law which is settled beyond contradiction, it is the rule that parol evidence is inadmissible to vary the terms of a written contract. Except where some custom or usage exists, so well-established and generally known that it must be taken to be incorporated with the contract, and at the same time not inconsistent with its clearly expressed terms, such evidence must be disregarded. Le Duc v. Ward, supra; The Delaware, 81 U. S. (14 Wall.) 579, 20 L. Ed. 779; 3 Jones on Evidence § 459. Objection of the strongest nature

has been made to the admission of the evidence of custom just referred to, because the deviation clause is plain and unambiguous, with a clear and settled meaning, and cases have been cited which seem conclusive of its inadmissibility. Grace v. American Central Insurance Company, 109 U. S. 278, 3 S. Ct. 207, 27 L. Ed. 932; Portland Flouring Mills Company v. British & Foreign Marine Insurance Co. (C. C. A. 9) 130 F. 860, 65 C. C. A. 344, certiorari denied, 195 U. S. 629, 25 S. Ct. 787, 49 L. Ed. 352.

Apart from this question, however, we have seen that it was entirely insufficient to establish the alleged custom. The proof offered by the respondent, of other facts and circumstances extraneous to the bill of lading, must therefore be disregarded under the rule of evidence adverted to. In other words, all evidence tending to show that libelants had actual knowledge of the proposed itinerary, all evidence of the contents of the newspaper advertisements published before the vessel sailed, in brief, everything tending to indicate that libelants knew or ought to have known of the course (inconsistent with these bills of lading) which was intended to be taken, must be excluded from consideration. St. Johns, N. F., Shipping Corporation v. S. A. Companhia Geral Commercial Do Rio de Janeiro, 263 U. S. 119, 44 S. Ct. 30, 68 L. Ed. 201; The Delaware, 81 U. S. (14 Wall.) 579, 20 L. Ed. 779.

My attention has been called to Judge Partridge's decision in the case of W. R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha, 7 F.(2d) 889, decided as lately as September 15, 1925, and both parties insist that it is decisive here. While it is true that certain language there employed is favorable to respondent's contentions, I think the reasoning of the opinion distinctly favors the libelants. That case had to do with a shipment of nitrates from Iquique and Antofagasta, Chile, to Honolulu. The vessel, instead of taking the direct route, proceeded northward, stopping at various ports, to San Francisco, and thence to Portland, Or., where she completed cargo. Immediately after leaving that port, she was destroyed by fire, and all her cargo was lost. It was not claimed that she should have taken the direct route. On the contrary, libelant's claim was that the "usual and customary" route was northerly to San Francisco, and *thence* directly to Honolulu. Liability as for a deviation was asserted, in spite of a clause of the bill of lading which gave the carrier "liberty to touch at any port or

ports * * * in or out of the customary route," because of the inclusion of Portland in the vessel's itinerary. Judge Partridge held that there was no such liability, and I may say that I think his decision absolutely correct.

After citing numerous cases, including that of The West Aleta, in which the doctrine of Glynn v. Margetson, supra, has been followed, he stated that the real intent of the contract between shipper and carrier, with which all deviations must be consistent if they are to be excused by a "liberty to call" clause, is the main commercial purpose of that contract, and that accordingly the propriety of any particular deviation is a question of fact in each case, with no fixed rule for its determination. With this there can be no quarrel. Where, as in the case then at bar, there is a well-established custom, of which the shipper has knowledge, for vessels bound for a given destination to proceed upon an indirect route, under the terms of even the narrowest "liberty to call" clause, there would be no liability for doing so, and whether or not a further deviation from that route would be justified by a clause including ports "in or out of the customary route" is another question, which was not decided by Judge Partridge, because at the time of shipment in the case before him, as was known both to libelants and the general public, the customary route had been changed, so as to include the port in question.

Parol evidence is, as he stated, admissible to show what the usual route is, in interpreting the deviation clause; no matter how great its latitude. But it never is admissible to prove knowledge on the part of, or a parol understanding with, a shipper that *the particular vessel* will deviate from the route between its ports of departure and destination, for this in effect would be to permit a contradiction of the implied provision of every bill of lading that no deviation inconsistent with its general commercial purpose will be undertaken. Le Duc v. Ward, supra. In W. R. Grace & Co. v. Toyo Kisen Kabushiki Kaisha, supra, it was not a contradiction of the contract of carriage to permit evidence to be given that four of the respondent's vessels, with the advertised intention of changing the customary route, prior to libelant's shipment, had returned via Portland. The fact that libelant had personal knowledge of the intention of the vessel on which his goods were to be carried to pursue that route was not essential to the result of the case, and must be regarded as

purely accidental, except in so far as it goes to show a general knowledge of the change in custom. It may be added that, if the mere receipt of notice of an intention to deviate, in a manner inconsistent with the terms of a bill of lading, is sufficient to permit a carrier to do so with impunity, the protection of a written instrument is very slight indeed.

[5, 6] Such being the case, it is apparent under the evidence that in proceeding toward Hamburg the West Aleta was guilty of a deviation which made her owner liable as an insurer for the safety of the cargo. At this point, however, the contention is made by respondent that it is entitled to the full benefit of the insurance paid to libelants for their losses. The rule is well established that a deviation changes the character of a voyage so essentially that a shipowner who has deviated cannot claim the benefit of the terms of a bill of lading. An unjustifiable deviation vitiates or avoids the contract of carriage, and the failure to comply with what in effect is a condition or warranty not to deviate displaces it. The Sarnia (C. C. A.) 278 F. 459, 463; Thorley v. Orchis Steamship Company, [1907] 1 K. B. 660. In such circumstances, the carrier cannot escape liability by reason of the relieving clauses which have been inserted in the bill of lading for its benefit. St. Johns, N. F., Shipping Corporation v. S. A. Companhia. Geral Do Rio de Janeiro, supra; Pacific Coast Co. v. Yukon Independent Transportation Co. (C. C. A. 9) 155 F. 29, 83 C. C. A. 625; Carver on Carriage of Goods by Sea, § 287. Since it is not a condition precedent to suit for loss, after a deviation, that the cargo owner shall have been deprived of his right against the insurer (The Citta di Messina, 169 F. 472, 475; [D. C.] Smith v. United States Shipping Board Emergency Fleet Corporation, supra), this contention of respondent also must fail.

[7] It is further argued that the United States Shipping Board Emergency Fleet Corporation is only suable as a corporation under the Suits in Admiralty Act of 1920 (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼l), under the provisions of which all rights of action are barred. On exceptions to the libels in these cases, Judge Partridge held that the suits were not barred or affected by the provisions of that act (Rosenberg Bros. & Co. v. United States Shipping Board Emergency Fleet Corporation (D. C.) 295 F. 372), and such was Judge Hand's opinion in The West Aleta, supra. I think the question requires no further discussion.

[8] The final contention, that laches are imputable to libelants, is without merit, for the reason that these suits were brought well within the four-year period of limitations prescribed by the California statute. A court of admiralty sitting in this state will by analogy follow its statutes of limitations (Pacific Coast Steamship Co. v. Bancroft-Whitney Co., supra), and according to those there have been no laches here.

[9] As the measure of damages for failure to deliver cargo is the market value of the goods at the port of destination at the time the vessel should have arrived (36 Cyc. 275; St. Johns, N. F., Shipping Corporation v. S. A. Companhia Geral Do Rio de Janeiro, supra; Carver on Carriage of Goods by Sea [6th Ed.] § 727), libelants are entitled to recover the values set forth in the agreed statements of fact. It is therefore ordered that decrees issue in favor of libelant California Wine Association for the sum of $642,871, interest, and costs; in favor of libelant Rosenberg Bros. & Co. for the sum of $20,782.79, interest, and costs; and in favor of libelant S. L. Jones & Co. for the sum of $4,481.66, interest, and costs.