## WESTERN LUMBER MFG. CO. v. UNITED STATES et al., and three other cases.

(District Court, N. D. California, S. D. December 15, 1925.)

Nos. 17916, 17934, 17981, 18008.

1. Shipping ⬅125—Carrying shipments for Atlantic ports from San Francisco to Northern Pacific ports held deviation.

Carrying shipments for Atlantic ports from San Francisco to Northern Pacific ports before proceeding to Atlantic ports held deviation.

2. Shipping ⬅136, 141(1)—Deviation deprives carrier of all exemptions, statutory and otherwise.

Deviation deprives carrier of all exemptions, statutory and otherwise, and master's negligent operation of vessel during deviation does not bring loss within Harter Act, § 3

(Comp. St. § 8031), relieving owner of liability for errors in navigation.

**3. Evidence ⬡441(14)—Oral agreements, prior to or contemporaneous with execution of bills of lading, are inadmissible.**

Oral agreements, prior to or contemporaneous with execution of bills of lading, are inadmissible under parol evidence rule.

**4. Shipping ⬡106—Oral agreements, after execution of bills of lading, must be supported by consideration.**

Oral agreements, made after bills of lading were executed, permitting deviation which would extend time for delivering goods by two weeks, and add carriage of 2,000 miles, must be supported by consideration.

**5. Shipping ⬡106—Oral agreements between consignors and carriers held not to change carrier's liability under bills of lading.**

Consignors, forwarding bills of lading with drafts attached, merely retained security title, and beneficial interest and risk of loss passed to consignees, and subsequent oral agreements by consignors as to route did not change carrier's liability under bills of lading.

**6. Shipping ⬡106—Alteration of negotiable bills of lading by oral testimony is not favored, and should be at least proved in satisfactory manner.**

Alteration of negotiable bills of lading by oral testimony is not favored by courts, and should be at least proved in satisfactory manner.

**7. Shipping ⬡132(5)—Evidence held insufficien to show modification of bills of lading, so as to permit deviation.**

Evidence *held* insufficient to show modification of bills of lading by oral agreements, so as to permit carriers to deviate.

**8. Shipping ⬡143—Shipping Board held liable for loss of goods shipped under its bills of lading on vessel not owned by it.**

Where bills of lading issued by agents of United States Shipping Board provided that goods were to be transported by designated steamer, or any subsequent vessel, whether belonging to said corporation or any other owner, board was liable for loss of goods shipped on vessel not owned by it.

**9. Shipping ⬡106—United States Shipping Board held liable for loss of goods, notwithstanding bills of lading specified vessel not owned by board.**

That bills of lading issued by agents of United States Shipping Board, purporting to bind board, specified vessel not owned by board, *held* not to relieve board of liability for loss; action being within agents' authority.

**10. Shipping ⬡132(1)—Shipper, suing for loss from deviation, must rescind contract and sue for value of goods, or sue for damages for breach of contract.**

Even if unauthorized deviation without intent to convert goods constitutes conversion, shippers must rescind contract for carriage and sue for value of goods, or sue for damages from breach of contract of carriage and they cannot do both.

**11. Admiralty ⬡26—Suits in Admiralty Act authorizes suits in personam as well as in rem.**

Suits in Admiralty Act (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼l) authorizes suits against the United States in personam as well as in rem.

In Admiralty. Separate suits by the Western Lumber Manufacturing Company, by Chickering & Sons, by the California Cotton Mills Company, and by Max Fass and others against the United States of America and others. Decree for libelants.

See, also, 9 F.(2d) 1004.

Golden W. Bell and Bell & Simmons, all of San Francisco, Cal., for libelants in first three cases.

Carroll Single and Derby & Single, all of San Francisco, Cal., for other libelants.

Sterling Carr, U. S. Atty., of San Francisco, Cal., Frank Maytham, Sp. Asst. Atty. Gen., and Farnham P. Griffiths and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for respondents.

KERRIGAN, District Judge. These are suits in personam for failure to deliver cargo. The goods in each case were delivered in San Francisco, for carriage by one or all of the respondents to a seaport on the Atlantic Coast. They were not delivered at their destination, but were in fact lost through an error of navigation upon the coast of Oregon.

The theory of libelants' case is that the carriage which diverted the goods from their transit to the eastern coast was a deviation from the bills of lading, and in consequence that the parties to those instruments are liable for breach of contract; that the respondents, who were not parties to said bills of lading, but who, nevertheless, embarked the goods upon their northern voyage, as well as the carrier which bore them north, are liable in tort for conversion; and, finally, that, if any party whose name was signed is not contractually liable, then the purported agent is liable for breach of implied warranty of authority.

The Pacific Steamship Company (Admiral Line) was Pacific Coast agent for the North Atlantic & Western Steamship Company (Nawsco Line), which acted as managing agent for the United States Shipping Board Emergency Fleet Corporation in the operation of government-owned vessels. Nawsco Line operated for its own account the steamer Brush, which until October 10, 1922, had been owned by the United States.

During the month of March, 1923, the

Admiral Line·received from libelants the several shipments referred to in these libels. It was intended that all of them, except that of Max Fass, should go forward on the Cold Harbor, which was a government-owned vessel, and until after the dock receipt had been issued that shipment also had been intended for the vessel named. Cold Harbor bills of lading were issued in the other cases, and stamped by the Admiral Line as Nawsco Line agents, agents for the Emergency Fleet Corporation. The Max Fass bill called for, transportation on the Brush, but in all other respects was identical with them. It was signed in the same manner, and purported to bind the Fleet Corporation.

While the Cold Harbor was being loaded, it was discovered that because of overbooking she could not take all the San Francisco and other cargo which had been assigned to her. For reasons not affecting libelants, it was considered more expedient to reroute some of the San Francisco cargo than that from intermediate ports, and with the exception of a small portion of the California Cotton Mills shipment, all of libelants' cargo was shut out. That remaining was loaded on the Brush. Officers of the Admiral Line say that this was done pursuant to oral arrangements, made with all but one of the shippers; but on the part of libelants the existence of any such arrangements is vigorously denied.

[1] The Brush was not bound from San Francisco directly to the Atlantic Coast. On the contrary, she was bound north to various ports in Oregon and Washington, and thence *back* to San Francisco for additional cargo. She had cargo on board which apparently had been received on the Atlantic Coast for delivery in Oregon and Washington, and hence appears not to have been beginning a southern and eastern voyage, but to have been completing one to the west and north. That under these circumstances there was a deviation is not open to question. The West Aleta (Rosenberg Bros. & Co. v. United States Shipping Board Emergency Fleet Corporation), D. C., 7 F.(2d) 893, 895.

[2] Nor may it any longer be maintained that the master's negligent management of the vessel brings the case within section 3 of the Harter Act (Comp. St. § 8031). Judge Partridge's decision to that effect, rendered July 31, 1924 (Max Fass v. U. S. S. B..E. F. C., 9 F.[2d] 1004), not only is the law of this case, but in my opinion is sound, for deviation deprives a carrier of all exemptions, statutory and other. Respondents, however, rely upon the special agreements above referred to, according to which no deviation took place.

[3, 4] With this position there are more difficulties than one. To begin with, the rule which excludes parol evidence of variations of the terms of a written contract is clearly applicable to all verbal agreements entered into prior to or contemporaneously with the execution of the bills of lading. The Delaware, 14 Wall. 579, 606, 20 L. Ed. 779; The West Aleta, supra. A contention that they occurred subsequently is equally untenable, for no considerations for the modifications in question have been alleged. Respondents set up oral agreements which increased by two weeks the time of performance of existing contracts, and added a carriage of 2,000 miles to the risks of transportation, to offset which a consideration in each case was a necessary prerequisite to validity. 13 C. J. 592.

[5] Furthermore, in more than one instance the consent of consignors is alleged to have been obtained after they had forwarded bills of lading for presentation to consignees, with drafts attached. Respondents argue that under such circumstances an intention was manifested to reserve the property in the goods until the drafts had been paid. 35 Cyc. 333. This contention overlooks the important fact that such procedure is effective only to retain a security title in the consignor, and that the beneficial interest as well as the risk of loss pass to the consignee as soon as the goods are shipped. Williston on Sales (2d Ed.) § 305. But, without entering further into technical considerations, there is an additional and decisive ground upon which it must be held that respondents' liability is fixed by the bills of lading as originally executed.

[6, 7] All but one of the asserted modifications were effected by means of a telephonic conversation, unconfirmed in any way by letter or memorandum. Despite the importance of such transactions, in no case was the identity of the person who represented the shipper definitely established. In the single case in which a personal interview actually was had, it clearly appears that a bill of lading was *subsequently* issued, calling for direct carriage to the port of destination. Oral testimony with regard to such matters is, I think, to be received with considerable caution. Laxity in the alteration of negotiable bills of lading is not to be favored by the courts, and a party alleging the commission of business faults, such as those which respondents maintain were committed here, should be required at least to prove his case in a satisfactory manner. In these cases, not

only is the respondents' evidence highly unsatisfactory, but in several instances it is directly refuted. I therefore am constrained to hold that the attempted modifications of these bills of lading were of no effect, and that the instruments are binding as originally executed.

[8] The next controversy is as to what parties are chargeable. The bills of lading are all identical in terms, and each bears the signature of the Shipping Board, placed there by an agent of the Admiral Line authorized to sign such bills on its behalf. All of them contain the following provision with reference to goods shipped: "To be transported by the steamer mentioned, or by any succeeding steamer or vessel, *and whether belonging to said corporation or to any other owner.*" Such a clause without doubt authorized a substitution of vessels, and, since it is a usual provision in bills of lading, its insertion was authorized by an express term of the operating agreement of the Admiral Line and the Shipping Board. The latter, therefore, is liable for all goods for which Cold Harbor bills were issued, regardless of the fact that they were loaded on the Brush.

[9] In the case of Max Fass, however, it is urged that the Admiral Line was without authority to issue bills of lading, in the name of the Shipping Board, calling for carriage on a ship which it did not operate. It also is argued that the stamping and initialing of the bill of lading was a mistake, and that the clerk who made it had no intention to bind the Shipping Board. This latter argument, of course, assumes that the bill of lading was not intended to be the contract of the principal whose stamp was used, and fails, I think, because the preliminary steps which led up to the final transaction show that only a substitution of vessels, and not one of carriers, was intended. The fact that the name of the Brush was inserted is immaterial, for, even had the name Cold Harbor been used, the carriage would have been on the former. The fact remains that a booking had been made for a government-owned vessel with the representative of the Shipping Board, and that in performance of that contract with the shipper's consent a vessel operated by the representative was chosen to carry the goods. That such action clearly was within the authority of the Admiral Line follows from the some considerations.

This renders it unnecessary to consider the question of subsequent ratification, on which libelant placed considerable weight, and which might, in and of itself, be sufficient on this branch of the case. It also eliminates the question of warranty of authority, since all the contracts are held to be binding upon the parties on whose behalf they were made.

[10] The question remains whether or not the wrongful deviation constituted, not only a breach of contract, but also amounted to a tortious conversion of goods, for which all the participants are liable as joint tort-feasors. Admittedly the Admiral Line's employees loaded the goods upon the Brush, knowing that it would carry them north, instead of south, and admittedly the Nawsco Line was owner of the vessel on which they were carried. But the question arises whether a deviation, in the absence of an intent to convert to the carrier's own use, in and of itself is an actionable wrong.

An examination of the authorities discloses a singular lack of harmony among them, although on principle the rule should be quite clear. There can be no doubt that (except in a very few jurisdictions) a carrier, while in the act of deviating, is absolutely liable for injury to or loss of goods within his custody. The expression frequently is met with that a deviation makes the carrier an insurer against loss from any cause. 4 R. C. L. 815. Why a converter should be spoken of as an insurer, or as a person absolutely liable, is a query prompted by the fact that in its usual sense a conversion leaves in the person converting no alternative but to respond in damages for the full value of the goods, whether they suffer injury or not.

A carrier should, on principle, not be made subject to liability where no damage results from a conversion, and it has been so held. 36 Cyc. 81. This, also, would seem to follow from what has been said to be the underlying theory here involved, which is that in contracts of affreightment there is an implied warranty against deviation (Hughes on Admiralty [2d Ed.] § 73), for breach of which in such case there could be no more than a nominal recovery. The necessity for allowing a shipper, thus protected, to treat the carrier as a converter, may well be doubted. But in some of the older cases it is said that a deviation is a positive misfeasance, which gives the shipper a right to rescind the contract of carriage, and immediately to treat the goods as converted. In others, the right, as indicated above, is founded on breach of warranty, and the shipper is said to have a right of election, *either* to rescind the contract and treat the goods as converted by the carrier, *or* to accept them and hold him to an insurer's liability. 4 R. C. L. 815, 816.

A noticeable feature of each of these theories is that, before the shipper may treat

the deviation as a conversion, he must manifest an intention to rescind the contract. On no theory may he demand the value of the goods, treating them as the property of the carrier, and at the same time exact damages for breach of a contract to carry and deliver them. Yet in the present case this is exactly what libelants have attempted to do. In suing the Shipping Board, they maintain that they are entitled to damages for failure to execute the provisions of certain bills of lading, at the same time in effect maintaining that the Nawsco and Admiral Lines, as well as the Shipping Board, are liable on causes of action to the existence of which rescission of those bills of lading is a condition precedent. The contracts of carriage must, since libelants insist upon compensation for their breach, be held valid and subsisting, and recoveries on them must be allowed. But to allow a recovery in tort would be to hold the contract rescinded as to some of the respondents and at the same time binding upon others. Assuming, but not deciding, that the act of deviating amounted to a conversion, libelants clearly are in no position to assert that fact.

[11] The final position taken by respondents is that the United States may not be held liable, since it was not a party to the bills of lading, and because the Suits in Admiralty Act (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼l), does not comprehend a suit in personam where no lien against a vessel exists, and where accordingly a suit in rem could not have been brought, had the vessel been privately owned. It is urged that the purpose of the act was to avoid seizures resulting from libels in rem against government-owned vessels, as contradistinguished from those following libels in personam, which, because of the solvency of the United States, never were to be apprehended. In The Cape Fear, 8 F.(2d) 80, 1923 A. M. C. 528, 530, this reasoning was accepted, the court declining to follow three decisions which refused it. There is, however, a serious conflict in the authorities. Markle v. United States, 8 F. (2d) 87, 1925 A. M. C. 1236, 1240.

After due consideration, I am inclined to agree with Judge Learned Hand, who in Agros Corporation v. United States, 8 F.(2d) 84, 1923 A. M. C. 542, said: "I think that it is impossible to read the Suits in Admiralty Act * * * without concluding that Congress intended to provide for suits which are in the nature of in personam as well as in rem." His views are in accord with those of the author of the latest edition of Bene-

dict on Admiralty (5th Ed. § 192), and seem to me to be well founded.

Libelants accordingly are entitled to decrees against the United States, as well as against the Shipping Board, for the value of their goods at the time and place at which delivery should have been made. The cases are referred to Commissioner Krull to ascertain the amounts of damage, for the usual report and recommendations.